## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BOARD OF EDUCATION FOR THE
SILVER CONSOLIDATED SCHOOLS,

        Plaintiff,

v.                               No. 1:25-cv-586

LINDA MCMAHON, in her official capacity
as Secretary of Education; U.S. DEPARTMENT
OF EDUCATION and DONALD J. TRUMP,
in his official capacity as President of the United
States of America,

        Defendants.

## <u>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

**COMES NOW**, the Board of Education of the Silver Consolidated Schools (hereinafter "School District"), by and through its counsel of record, Himes, Petrarca & Fester, Chtd. (Andrew M. Sanchez), and brings its Complaint for Declaratory and Injunctive and against Defendants, Linda McMahon, in her official capacity as Secretary of Education, the United States Department of Education (the "Department"), and Donald J. Trump, in his official capacity as President of the United States (collectively "Defendants") pursuant to 28 U.S.C. § 2201. In support thereof, the School District states as follows:

### INTRODUCTION

The School District is the recipient of a $6 Million award from a federal mental health grant distributed over a five (5) year period that has been authorized and appropriated by Congress. It is part of a $1.0 Billion spending package and was signed into law by President

1

Biden on June 25, 2022, known as the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022). The Bipartisan Safer Communities Act was passed by Congress in the wake of the horrific Uvalde school shooting that occurred on May 24, 2022, at Robb Elementary School in Uvalde, Texas, in which nineteen (19) elementary school students and two (2) teachers were gunned down in the deadliest school shooting in Texas history and second deadliest in the entire United States behind the school shooting at Sandy Hook Elementary School in Connecticut in 2012. The Act was intended to strengthen gun purchase background checks, mental health issues support and school security, while still not fully addressing the call for new federal gun legislation restricting the sale and possession of firearms.

The Bipartisan Safer Communities Act expanded access to mental health services and addressed the trauma of gun violence affecting so many communities. Most notably, the Act expanded access to school-based behavioral health services for children and families. The Act provided funding to increase awareness of mental health issues among school-aged children, and youths; funding to train school personnel and other adults who interact with school-aged children and youths to detect and respond to mental health issues; and funding to help connect these children and youths with the care they may need. The Act also provided funding to increase the number of mental health service providers in public schools; train primary care providers and pediatric primary care providers to be able to better provide mental health care and connect patients to mental health experts; improve treatment programs for children and adults who have experienced trauma; and support implementation of the 9-8-8 Suicide and Crisis Lifeline.

On April 29, 2025, Defendant U.S. Department of Education, by and through its Office of Planning, Evaluation, and Policy terminated the grants, including the grant to the School District and determined that the funding for the mental health grants reflected the prior Administration's

priorities and policies that are not shared by the current Administration. The Department determined that the mental health "programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds."

Without statutory authority and in violation of the Constitution, the Defendants acted to terminate vital and necessary federal funding that had been mandated by Congress and directed to assist students and communities, and they did so without any of the necessary review or assessment of the value brought to local school districts by the grants. As a result of the Department's improper termination, the School District has been and will continue to be deprived of essential funding required to continue its mental health programs and the continuation of the Department's unlawful terminations will irreparably harm other similarly situated school districts. As such, the School District respectfully requests that this Court award relief to address the irreparable harm that continues to result from Defendants' unlawful actions.

In support of their claims, Plaintiff further avers as follows:

## PARTIES

1.      The Plaintiff School District is governed by a Board of Education, who is the governing body of the Silver Consolidated Schools, and the School District is a political subdivision of the State of New Mexico created for the administration of public schools in and around Silver City, New Mexico and within the County of Grant, New Mexico, as set forth under N.M. Stat. Ann. § 22-1-2(R) (2003).

2.      The Board of Education is a legal entity with the capacity to sue under State law.

3.      In this cause of action, the School District is at risk of losing its entitlement to federal grant funds awarded to Plaintiff pursuant to the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022), if the termination of the grants by the Defendants is allowed to continue.

4.      Defendant Linda McMahon is the Secretary of the U.S. Department of Education ("Department") and, as such, is charged by statute with the administration of federal legislation for the benefit of students and local school districts and all other laws relating to the allocation of federal funds, including grant funds to that end, as required by Congress.  She is sued in her official capacity only.

5.      Defendant U.S. Department of Education is a federal cabinet agency headquartered in Washington, DC, at 400 Maryland Avenue, S.W., Washington, DC 20202.

6.      Defendant Donald J. Trump is the President of the United States and is sued in his official capacity only.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this cause of action because the claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because Defendants are United States officials, *see* 28 U.S.C. § 1346(a)(2), and 5 U.S.C. § 702 (final agency action).  This Court may issue a declaratory judgment and award further relief pursuant to 28 U.S.C. §§ 2201-2202 and RULE 57 and RULE 65 of the FEDERAL RULES OF CIVIL PROCEDURE.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), (e)(1), because Defendants are agencies of the United States and/or officers of the United States acting in their

official capacities, and a substantial part of the events or omissions giving rise to the claims herein occurred in this District, and the Plaintiff School District resides in this District.

9.      This Court is authorized to vacate and set aside the grant termination by the Defendants under 5 U.S.C. § 706(2).

10.     Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702.

## MATERIAL FACTS

11.     Since taking office in January, President Trump has issued a staggering number of executive orders some which prohibit federal agencies from supporting any and all initiatives relating or pertaining to social policies that he opposed during his political campaigns, including "diversity, equity, and inclusion" or "DEI."

12.     In the first two days of President Trump's new administration, the President issued two Executive Orders addressing diversity, equity, and inclusion.  The January 20, 2025 Order ("J20 Order"), titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," focused on ending DEI programs within the federal government.  *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1.  The January 21, 2025 Order ("J21 Order"), titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," focused on "enforcing civil rights laws" by "ending illegal preferences and discrimination" in both the federal government and the private sector.  *See* Exec. Order No. 14173, 90 Fed. Reg. 8633, § 1.

13.     On January 29, 2025, President Trump issued Executive Order No. 14190 "Ending Radical Indoctrination in K-12 Schooling,"  90 Fed. Reg. 8853 (Feb. 3, 2025).  The Executive Order requires the Secretary of Education, Secretary of Defense, and Secretary of Health and Human Services, in consultation with the Attorney General, to develop a plan for "eliminating  Federal  funding  or  support  for  illegal  and  discriminatory  treatment  and

indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology" within 90 days from the date of the Executive Order. *Id.* at § 3(a)(i).

14.     These executive orders fail to define some of the key terms they include, such as "equity-related," "programs promoting DEI," "illegal DEI," and "DEIA principles."

15.     In carrying out the President's executive orders, Defendants issued a Directive conditioning the provision of federal monies entitled "Eliminating Discrimination and Fraud in Department Grant Awards" on February 5, 2025.

16.     The Directive was intended, in part, to terminate previously awarded grants by the previous Administration with any subjectively perceived relationship to the prohibited topic of "DEI."

17.     The Directive instructs the Department's officials to review all new and ongoing grants and all notices of funding opportunities and eliminate them if they run afoul of any one of five different prohibitions, which include "DEI" that is contrary to "the Department's policy objectives."

18.     On February 14, 2025, the Department, by and through its Acting Assistant Secretary for Civil Rights, issued a Dear Colleague Letter (DCL") threatening schools and colleges across the country with the loss of federal funding if these education institutions continued to pursue ambiguously defined "DEI programs" that "teach students that certain racial groups bear unique moral burdens that others do not" and/or "stigmatize students who belong to racial groups." *See* DCL attached as <u>Exhibit A</u>.

19.     The DCL purports to address the Department's new interpretation of "Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the United States Constitution, and other relevant authorities." <u>Exhibit A</u> at 1.  It applies to "schools," encompassing "preschool,

elementary, secondary, and postsecondary educational institutions that receive federal financial assistance from the Department." *Id.* at n.1.

20.    The DCL shifted longstanding enforcement positions by the Department on federal civil rights laws that previously guaranteed equality and inclusion in schools, but now acts to impermissibly infringe upon the authority of the states and local school districts to govern public education, as well as infringe upon the First Amendment rights of educators and students.

21.    Although styled as a traditional technical support and guidance document, this DCL does not operate as any other Dear Colleague Letter.[1]

22.    The DCL concluded immediately in the form of all-encompassing conclusions that all schools are engaged in discrimination and then, without legal or factual support, announces new rules identifying categories of unlawful activity, invites complaints, and issues a deadline before the Department will take "appropriate measures." Exhibit A at 3.

23.    Contrary to civil rights laws over the last 60 years and the federal education laws, regulations, guidance, and court interpretations of the laws, the DCL pronounced the Department's position that any equity, diversity or inclusion programming is now unlawful.

24.    The DCL also announced that that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism'" and has "advanced discriminatory policies and practices"; and that schools have used "'diversity,

---

[1]  Prior to this Administration, Dear Colleague Letters provided guidance and statutory interpretation within the scope of Department's proper authority as identified and explained in the language of the law as written by Congress and interpreted in federal court decisions, assessed relevant data and other factual information, and provided additional guidance regarding how the Department will apply the established law to factual circumstances in the course of its investigations and enforcement actions. *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT; U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug.14, 2023), https://perma.cc/V7Z6-XMCM; U.S. Dep't of Educ., Off. of the Undersec'y, Strategies for Increasing Diversity and Opportunity in Higher Education, https://perma.cc/52W4-XJFR.

equity, and inclusion' ('DEI')," as a means of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline."  Exhibit A at 1–2.

25.    The DCL is unencumbered by the results of any investigation conducted by the Department, sampling of court cases and their rationale, student or instructional data or any scholarly research on the topic.  The DCL does not even attempt to explain the Department's own reasoning and justification for its declarations and change from previous positions.

26.    The DCL provides no guidance that would help any school to understand how the Department would apply existing legal precedent that is clearly contrary to its conclusions based on the facts of any particular case.  Most significantly, the DCL provides no definitions of key terms or of the practices that the Department now deems discriminatory, including lacking a definition of "diversity," "equity," or "inclusion."

27.    The DCL promulgates new rules finding that "DEI programs . . . deny students the ability to participate fully in the life of a school."  Exhibit A at 3.  The Department fails to provide any support for its pronouncement that these actions are unlawful, as a matter of law.

28.    Two weeks after the issuance of the DCL, the Department issued a document titled, *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* ("FAQ").[2]  In this document, the Department denounced the dangers of DEI and asserted that schools "have sought to veil discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching." *Id.* at 6.

29.    The DCL is not only unconstitutionally vague; it also encroaches upon teaching and academic freedom recognized by Congress and the courts, as well as on prohibitions on

---

[2] U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf ("FAQ").

federal intrusion into curriculum, instruction, and materials that are longstanding in the body of federal law. With regard to K-12 education that is provided by the states and their subdivisions, Congress expressly prohibited the Department from involvement in local curricular decisions.

30.    Under the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act ("ESSA"), 20 U.S.C. §§ 6301–7981, which is the primary federal statute governing K-12 education funding, the statute establishes a formula for funding and for competitive grants to the states, local education agencies, schools, non-profits, and institutes of higher education "to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational opportunity gaps." *Id.* § 6301.

31.    The ESSA explicitly prohibits the Federal Government from interfering with states' curriculums, instructional content, and related activities across all of its titles involving federal grants. *See, e.g.*, *id.* § 7906a; *id.* § 7907(b) ("Notwithstanding any other provision of Federal law, no funds provided to the Department [of Education] under this chapter may be used by the Department, whether through a grant, contract, or cooperative agreement, to endorse, approve, develop, require, or sanction any curriculum . . . designed to be used in an elementary school or secondary school."); *id.* § 7907(c)(1) ("Nothing in this section shall be construed to—(1) authorize an officer or employee of the Federal Government, whether through a grant, contract, or cooperative agreement to mandate, direct, review, or control a State, local educational agency, or school's instructional content, curriculum, and related activities.").

32.    The General Education Provisions Act ("GEPA"), 20 U.S.C. §§ 1221–1234i, governs the administration of all federal education programs. The GEPA prohibits the federal government from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or

school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system." *Id.* § 1232a.

33.    The Department of Education Organization Act ("DEOA"), 20 U.S.C. §§ 3401–3510, which established the Department in 1979, similarly prohibits the Department from exercising "direction, supervision, or control" over a range of activities, including "over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." *Id.* § 3403(b).

34.    In declaring these education practices unlawful and as justification for withholding federal funds, the Department has not just encroached upon the purview of the courts to rule on what the law is, it has exceeded the scope of the statutes by which it is controlled.

35.    The Department has issued new rules and is simply ignoring its own prior guidance and interpretation of the law and fails to provide any explanation whatsoever for its complete reversal in position.  The DCL also ignores its own prior publications provided as guidance and directives on these topics.  *See* Note 1.

36.    The DCL fails to acknowledge or support the rationale of the Department in changing its position.  *See FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency must "display awareness that it is changing position" (emphasis omitted)).

37.    Various district courts have granted preliminary injunctions to enjoin enforcement of the Department's DCL and FAQ, undertaken in furtherance of the Executive Orders, based on the likelihood that these actions are unlawful. *See, e.g.*, *Nat'l Ass'n for Advancement of Colored*

*People v. U.S. Dep't of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212, at *7 (D.D.C. Apr. 24, 2025) (preliminarily enjoining enforcement of the DCL's certification requirement based on likelihood of success on constitutional vagueness claim); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *32 (D.N.H. Apr. 24, 2025) (preliminarily enjoining enforcement of the DCL ); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. CV SAG-25-628, 2025 WL 1191844, at *24 (D. Md. Apr. 24, 2025) (staying enforcement of the DCL under the Administrative Procedure Act pending final resolution based the plaintiffs' showing of a likelihood of success on the merits of their APA claim).

38.    The School District has not had the opportunity to knowingly accept or reject the federal funds based on the new rules from the Department since they appear to be actions taken by an agency without the requisite support in law or fact.  What is clear, however, it that the School District cannot continue to deliver the quality of instruction, programming, student supports and professional development that its students and school community deserves without federal funds.

39.    Educators and school districts across the country, including the Plaintiff School District have invested in their educational practices to be in compliance with federal law, including in their own training and professional development, and in designing their courses, student supports and curriculum.  Indeed, laws, regulations, and other guidance and interpretation address the provision of equal educational opportunity and inclusion in many ways, including for students on the basis of race, ethnicity, national origin, sex, and for students with disabilities, English learners, and students experiencing homelessness.[3]

---

[3]  *See, e.g.*, the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq.*), the Rehabilitation Act of 1973 (20 U.S.C. § 701 *et seq.*), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. § 2301 *et seq.*), the Workforce Innovation and Opportunity Act (29 U.S.C. § 3101 *et seq.*), the Head Start Act (42 U.S.C. § 9831 *et seq.*), the Child Care and Development Block Grant Act of 1990 (42 U.S.C. § 9858 *et seq.*), the Education

40.    The DCL promulgates new and unsupported requirements on local school districts without providing any opportunity for the school districts to prepare and plan to incorporate these new rules from the Department.  It is further complicated by the fact that the DCL's new requirements are in conflict with federal law and contrary to many of the professional requirements and best practices for providing an appropriate education to students.

41.    The Department uses the DCL to promulgate substantive rules and obligations upon local school districts under the threat to vigorously enforce them without proceeding through the notice and comment process required specifically by Congress in the Administrative Procedures Act ("APA"), 5 U.S.C. § 553.

42.    While the DCL invites comments in a footnote, it is clear that the Department is aware of the requirements of notice-and-comment rulemaking, including the use of the Federal Register, but the Department makes no attempt to follow the established procedures for such formal rulemaking.  *See* Exhibit A at 1 n.3.  Section 553 of the APA requires that notice and comment be solicited from the public and stakeholders before "not less than 30 days before [the rule's] effective date."  5 U.S.C. § 553(d).

43.    While the DCL's requirements on local school districts are ambiguous, the Department's threat to enforce them are crystal clear.  The DCL states that the Department "intended to take appropriate measures to assess compliance with the applicable statues and regulations based on the understanding embodied in this letter beginning no later than 14 days from today's date," that being February 28, 2025. *See* Exhibit A at 3.

---

Sciences Reform Act of 2002 (20 U.S.C. § 9501 *et seq.*), the Education Act of 2002 (20 U.S.C. § 9601 *et. seq.*), the National Assessment of Educational Progress Authorization Act (20 U.S.C. § 9621 *et seq.*), the McKinney-Vento Homeless Assistance Act (42 U.S.C. § 11301 *et seq.*), and the Adult Education and Family Literacy Act (29 U.S.C. § 3271 *et seq.*).

44.    The language of the DCL is phrased as specific directives to all educational institutions receiving federal funds.  The DCL communicates to schools that enforcement action is coming swiftly, within 14 days, based on the DCL having already determined that all the schools are in violation and that the schools are directed to "cease all efforts" to violate the law as the Department perceives it in the DCL.

45.    Following the issuance of the DCL, the Department established an "End DEI" complaint portal for "parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in" schools. *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9.

46.    The "End DEI" complaint form invites only specific complaints and does not provide an avenue for filing other civil rights complaints within the Department's jurisdiction. *See* U.S. Dep't of Educ., End DEI Portal, https://perma.cc/GYS3-J2GR.  Instead, the Department solicits complaints focused on the communication of ideas that the Department and the President disfavors and subjectively describes them as "divisive ideologies and indoctrination." *See id.*

47.    The DCL also pressures "[a]nyone" who "believes" that a school has engaged in activities covered by the DCL to file a complaint with the Department and provides a link to its online complaint form.  *See* Exhibit A at 4.

48.    The "End DEI" portal is also focused on receiving complaints on "divisive ideologies and indoctrination".  *Id*.  It solicits complainants to identify the specific schools or school districts and to detail "concerning practices," and the portal indicates that the Department "will use submissions as a guide to identify potential areas for investigation."  *See* Press Release,

U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9.

49.      The Department fails to provide the public or the schools that are under its jurisdiction an explanation of the portal's objective, but it has relinquished this exclusive agency space to a private individual, identified as a co-founder of the political and advocacy organization entitled *Moms for Liberty*, which generally makes unsupported claims about schools "pushing critical theory, rogue sex education and divisive ideologies" and encourages parents to use the portal "to share the receipts of the betrayal that has happened in our public schools" through "pushing critical theory, rogue sex education and divisive ideologies." *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9.

50.      The Department's announced its abandonment of its duties and responsibilities to the organization *Moms for Liberty* in its press release announcing the "End DEI" portal, which demonstrates the extensiveness and chilling effect of the Department's actions and omissions. On February 15, 2025, *Moms for Liberty* characterized the DCL informing the departments of education of all 50 states that "they have 14 days to eliminate all Diversity, Equity, and Inclusion (DEI) programs in their public schools," and that "NO MORE Tax Payer Dollars will be spent on DEI! *See Moms for Liberty*, DEAR COLLEAGUE, Facebook (Feb. 15, 2025), https://www.facebook.com/story.php?story_fbid=935218675478809&id=100069720560290.

51.      The characterization of grant-funded programming that the Department would review depends entirely on subjective judgments and incorporates the same types of vague terms, viewpoints, and discriminatory prohibitions that have been found constitutionally suspect in other civil rights laws.

52.     Courts analyzing similar prohibitions have found this vague language would prohibit educators from describing or identifying discriminatory beliefs in an orientation or course, or assigning a reading or work in which an author describes or identifies discriminatory beliefs, like how current stereotypes about race may affect the opportunities of historically marginalized groups. *See Loc. 8027 v. Edelblut*, 2024 WL 2722254 (D.N.H. May 28, 2024) (appeal filed); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1149 (W.D. Okla. 2024).

53.     On April 29, 2025, the Department terminated the federal grants mandated under the Bipartisan Safer Communities Act, including the grants awarded to the School District. *See* Grant Termination Letter attached as Exhibit B; *see also* Affidavit of Superintendent of Schools attached as Exhibit C at ¶ 5, *infra*.

54.     The Department determined that the funding for the mental health grants reflected the prior Administration's priorities and policies that are not shared by the current Administration. The Department purportedly determined that the mental health "programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." *See* Exhibit B.

55.     Without statutory authority and in violation of the Constitution and the APA, the Defendants acted to terminate vital and necessary federal funding mandated by Congress directed to assist students and communities, and they did so without any necessary review or assessment of the value brought to local school districts by the grants.

56. The April 29, 2025 Termination Letter constitutes a final agency action under the APA and is unlawful.

57. In 2022, Congress passed and President Biden signed the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022). The Act amended the provisions of Section 330M of the Public Health Service Act, at 42 U.S.C. § 254c–19.

58. Section 254c–19 was amended by the Act to provide that "[t]he Secretary [of the U.S. Department of Health and Human Services], acting . . . in coordination with other relevant Federal agencies, **shall award grants** or cooperative agreements to States, political subdivisions of States, and Indian Tribes and Tribal organizations . . . to promote behavioral health integration in pediatric primary care . . . ." 42 U.S.C. § 254c–19(a) (emphasis added and internal citations removed).

59. Section 254c–19 was amended to provide the following: "To carry out this section, there are authorized to be appropriated, $31,000,000 for each of fiscal years 2023 through 2027." 42 U.S.C. § 254c–19(h).

60. It is from these provisions of law that the School Districts became recipients of the federal grants terminated by the Department in April. ". . . . the Department of Education will begin the process to disburse almost $300 million Congress appropriated in FY22 through both the Bipartisan Safer Communities Act and the FY22 Omnibus to help schools hire more school-based mental health professionals and build a strong pipeline into the profession for the upcoming school year. In total, the Bipartisan Safer Communities Act will invest $1 billion over the next five years in mental health supports in our schools, making progress towards the President's goal to double the number of school counselors, social workers and other mental

health professionals." *Fact Sheet: Biden-Harris Administration Announces Two New Actions To Address Youth Mental Health Crisis*, 2022 WL 3010155, at *1.

61.     Congress directed the Secretary of the U.S. Department of Health and Human Services in coordination with the Secretary of the Department of Education to award the grants, on a competitive basis, to eligible entities to provide funding consistent with the goals of Bipartisan Safer Communities Act.

62.     There are already Federal regulations that govern the procedures and the basis by which a Federal agency, such as the Department, may terminate a Federal grant award. *See* 85 F.R. 49506-49582. A Federal award may be terminated by the Federal agency if the agency determines that continuation of grant is in the best interest of the Federal Government. 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024).

63.     The Department is required to publish agency Priorities in the *Federal Register*, which must be used to select the Priorities for a competition and must have gone through public comment, unless one of the following exceptions apply:

    a.   The final annual priorities will be implemented only by inviting applications that meet the priorities;

    b.   The final annual priorities are chosen from a list of priorities already established in the program's regulations;

    c.   Publishing proposed annual priorities would seriously interfere with an orderly, responsible grant award process or would otherwise be impracticable, unnecessary, or contrary to the public interest;

    d.   The program statute requires or authorizes the Secretary to establish specified priorities; or

17

e.   The annual priorities are chosen from allowable activities specified in the program statute.

34 C.F.R. § 75.105(b)(2); 20 USC § 1232(d).

64.    The Department is also required to establish the specific Priorities that are included in the application for each competitive federal grant program, by publishing the Priorities in the Notice Inviting Applications for the grant in the *Federal Register*. *See* 34 C.F.R. § 75.105(b)(1).

65.    The Department has a unique statutory requirement it must also follow for setting agency Priorities for discretionary grants.  While the APA (5 U.S.C. § 553) exempts grants from the rulemaking process, the General Education Provisions Act (20 U.S.C. § 1232(d)) ("GEPA") states that, for the Department of Education, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program.

66.    Simply put, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process, unless one of the above exceptions apply.

67.    The Department followed these requirements, and Grant Recipients, including the School District were selected to receive funding from the Department for the entire five-year period allowed under the Bipartisan Safer Communities Act.

68.    The School District received a Grant Award Notification ("GAN") from the Department's grant management system.

18

69.     GANs are an official notification relating to a grant award.  Per the Department, "[t]he GAN is the official document that states the terms, conditions, and amount of an award, and is signed by the official who is authorized to obligate funds on behalf of ED."  *See* Dep't of Educ., *Grantmaking at ED — Answers to Your Questions About the Discretionary Grants Process* 29 (2024), https://tinyurl.com/ycycf85x (hereinafter "*Grantmaking at ED*").

70.     The Department has adopted the U.S. Office of Management Budget ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance") through its own regulations, including the Uniform Guidance's Remedies for Noncompliance.  *See* 2 C.F.R. §§ 200.339–343. *See also* 2 C.F.R. § 3474.1.[4]

71.     The Uniform Guidance provides several procedural safeguards that protect the interests of Federal grant recipients from ambiguous, vague, or shifting requirements, including before the termination of any award.

72.     The Uniform Guidance includes a requirement that grant terminations for a failure to "effectuate[] the program goals or agency priorities" be "pursuant to the terms and conditions of the federal award" and only "to the extent authorized by law."  2 C.F.R. § 200.340(a)(4).

73.     The Uniform Guidance, consistent with the Constitution's Spending Clause, additionally requires that a Federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the federal award."  2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30089 (underscoring the need for agencies "to clearly and unambiguously communicate termination conditions in the terms and conditions of the award").

74.     Federal grant recipients are also protected from sudden terminations of grants by the Department's policy, and the policy of the Uniform Guidance, to first provide assistance to

---

[4]  The Uniform Guidance was amended on April 22, 2024, and made effective on October 1, 2024.  *See Guidance for Federal Assistance*, 89 Fed. Reg. 30046 (April 22, 2024).

noncompliant grants before implementing suspension or termination. "If, in the course of monitoring, ED's staff identify areas of weakness or noncompliance, discover that the grantee is not making substantial progress, or have suggestions for how the grantee might better achieve the program objectives, [ED personnel] will provide technical assistance to help bring the project back on track. Unresolved monitoring findings can result in such actions as additional grant terms and conditions, recovery of funds, a decision to not award a continuation grant, or the termination of a grant." *Grantmaking at ED*, *supra* note 18, at 37.

75.    Finally, if the Department is unable to bring a grant-funded program into compliance and a grant is terminated, the Uniform Guidance provides the recipient with a fair opportunity to object by requiring that the Department "must provide written notice of termination to the recipient," that "include[s] the reason for termination," and that the Department "maintain written procedures for processing objections, hearings, and appeals." 2 C.F.R. §§ 200.341(a), 200.342; *see also* 85 Fed. Reg. 49509 (OMB stating that "agencies are not able to terminate grants arbitrarily").

76.    On information and belief, the Department published written federal grant termination appeal procedures for the first time on February 7, 2025, a week prior to the termination of the mental health grants. Although the Termination Letter provides that the School District can seek reconsideration within 30 days, it does not disclose how the Department will process any such request or objections or appeals and whether or how any hearings will be held. *See* U.S. Dep't of Educ., *Grant Termination Appeal Procedures* (February 2025) at https://tinyurl.com/3xpr6rvy.

77.    The terms and conditions set forth in the GAN to the School District as a grant recipient states that the Uniform Guidance, 2 C.F.R. part 200, applies as applicable.

78.     The Grant Termination Letter of April 29, 2025, cites to no authority that would permit the wholesale elimination of Federal grant programs established and funded by Congress.

79.     The Grant Termination Letter does not set forth any evidence that the School District's grant award resulted in any action or omission by the School District related to the activities listed as causes for termination in the Termination Letter.

80.     The Termination Letter does not describe any specific facts about the School District's use of the grant funds that the Department found to be objectionable, much less illegal.

81.     The unlawful agency action at issue here has resulted in irreparable harm to the School District and its students and its community.  The April termination of the mental health grants effectively terminates all of the School District's mental health programs and as well as nationwide.

82.     The illegal actions of the Defendants have and will continue to disrupt mental health and student support services and destabilize local school systems' ability to maintain greater school security and foster student mental health wellness.  The School District has and will receive $3,605,500 of the grant monies through December 2025 and, pursuant to the award, is entitled to $2,394,500 through 2027.  *See* Affidavit of Superintendent of Schools attached as Exhibit C at ¶ 4.

83.     Prior to the grant provided by the Bipartisan Safer Communities Act, the School District had only 19 mental health providers to serve the entire School District's population of approximately 2,500 students.  *See* Exhibit C at ¶ 7.

84.     This resulted in a student-to-provider ratio of 1 mental health provider-to-108 students.  *See* Exhibit C at ¶ 8.

85.     Following the award of the grant, the School District was able to fund the hiring of seven (7) mental health professionals with six (6) being licensed professionals, one (1) being an intern, one (1) being mental health support staff.  The School District was also able to contract with two (2) community mental health contractors to provide services.  *See* Exhibit C at ¶ 9.

86.     This resulted in an improved student-to-provider ratio of 1 mental health provider-to-75 students.  *See* Exhibit C at ¶ 10.

87.     The termination of the Federal grant at issue in this case will result in the loss of all grant-funded mental health positions reverting the School District to its pre-grant levels of student support and eliminate all crisis and all on-demand mental health counseling at the School District.  *See* Exhibit C at ¶ 11.

88.     The Federal grants funds allowed the School District to establish wellness rooms[5] at it schools.  *See* Exhibit C at ¶ 12.

89.     During the grant award, there were 7,725 student visits to the wellness rooms across all of the School District's campuses.  *See* Exhibit C at ¶ 13.

90.     In the 2024-2025 school year, 830 students or 40% of total School District enrollment received mental health services within the wellness rooms.  *See* Exhibit C at ¶ 14.

91.     Of all the students visiting a wellness room, in school year 2024-2025, 75% of the students reported improved well-being after their visit.  *See* Exhibit C at ¶ 15.

92.     The School District reported over 20 staff members engagements with grant-funded supports such as coaching and counseling.  *See* Exhibit C at ¶ 16.

---

[5] A wellness room is a dedicated space in schools where students and staff can go to take a break, practice self-care, and reduce stress and anxiety.  It has proven to reduce crisis situations with students and staff.

93.     Upon termination of the grant funding, all of the wellness rooms are in substantial risk of closure, which would eliminate a proven mental health support space and services used by nearly 50% of students.  *See* Exhibit C at ¶ 17.

94.     The School District reports that grant-funded mental health supports have reduced reports of bullying by nearly 30% across the School District in the last two school years.  *See* Exhibit C at ¶ 18.

95.     Disruptive behavior incidents at the high school have reduced from 189 incidents in the 2022-23 school year to 89 this school year (2024-2025).  *See* Exhibit C at ¶ 19.

96.     Out-of-school suspensions were reduced by 33% across the School District over the last two school years.  *See* Exhibit C at ¶ 20.

97.     Reports of bullying at the middle school were reduced from 16 reports to 6 reports over the last two school years.  *See* Exhibit C at ¶ 21.

98.     Disruptive behavior incidents at the middle school have reduced from 61 incidents in the to 25 this school year (2024-2025).  *See* Exhibit C at ¶ 22.

99.     The grant award also funded the acquisition and use of a mobile phone app by students for mental health wellness.  *See* Exhibit C at ¶ 23.

100.     During the pilot semester, the App was used for 107.8 hours by 483 students with 677 activities being completed on the App that semester.  *See* Exhibit C at ¶ 24.

101.     After the School District expanded use of the App from July-December of 2024, the App was used for 288 hours by 304 students with 4,896 activities being completed on the App.  *See* Exhibit C at ¶ 25.

102.     The top reported issues by students on the App are test anxiety, academic stress, procrastination and emotional regulation.  *See* Exhibit C at ¶ 26.

103.    The loss of the grant will result in the loss of 24 hour/7 days a week mental health support through the digital App for approximately 800 students, who may not be willing to seek mental health support in-person or in the wellness rooms.  *See* <u>Exhibit C</u> at ¶ 27.

104.    The grant award also allowed the School District to provide stipends for staff for mentoring of students and staff and to lead efforts to create an inviting culture for staff and for students.  *See* <u>Exhibit C</u> at ¶ 28.

105.    The loss of the grant monies will result in the collapse of staff culture due to the loss of coordinator stipends, materials and event funding for mental health supports.  *See* <u>Exhibit C</u> at ¶ 29.

106.    The grant also funded webinars focused on parent mental health resources in both English and in Spanish that had 407 views.  *See* <u>Exhibit C</u> at ¶ 30.

107.    The School District also used the grant funding for Father Support Circles and kinship caregiver workshops for grandparents and other family members raising their kin.  *See* <u>Exhibit C</u> at ¶ 31.

108.    The loss of the grant award will eliminate the School District's first ever comprehensive family mental health outreach programs.  *See* <u>Exhibit C</u> at ¶ 32.

109.    The grant award allowed the School District to create and maintain a pipeline for community members to become mental health providers by allowing internships supervised by a licensed mental health provider and to provide staff trainings to expand opportunities in mental health within the community.  *See* <u>Exhibit C</u> at ¶ 33.

110.    The immediate irreparable harm suffered by the School District includes but is not limited to:

a. Over 2,000 students will lose direct, personal access to trusted mental health support;

b. School District-wide student behavior and security gains will be jeopardized and lost;

c. Family mental health engagement will vanish;

d. Rural educator mental health support will be eliminated; and

e. A nationally recognized model for rural student well-being will be dismantled and lost.

*See* Exhibit C at ¶ 34.

## CAUSES OF ACTION

### COUNT I
#### DECLARATORY JUDGMENT

111.    The School District re-alleges and incorporates by reference the foregoing Paragraphs 1 through 110 as if fully set forth herein.

112.    An actual and substantial controversy exists between the School District and Defendants about whether 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024) permits Defendants to terminate congressionally mandated and authorized grant programs under the pretext of determining that the continuation of mental health grants are not in the best interest of the Federal Government.

113.    This action is presently justiciable because Defendants have asserted that 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024) permits the Department, as a matter of law, to terminate awarded grants on the grounds that the Defendants determined the grants are not now in the interest of the Federal Government in contrast to the statutory provisions of Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022),

amending the provisions of Section 330M of the Public Health Service Act, at 42 U.S.C. § 254c–19 to appropriate federal money for distribution of $1 Billion over five years as mandated in the statutes.

114.    The School District avers that the provisions of 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) only permit the termination of a federal award if the award no longer effectuates agency priorities identified as of the time of the federal award; these provisions do not independently permit or authorize such termination based on agency priorities identified or promulgated after the time of the Federal award.

115.    The Defendants are not permitted to violate the Constitution or statutory provisions of Federal law.

116.    The Defendants are required to comply with the provisions of the Administrative Procedures Act in taking any and all agency actions.

117.    Declaratory relief will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. § 2201, is appropriate to resolve this controversy.

## COUNT II
### FIRST AMENDMENT – FREE SPEECH AND FREE ASSOCIATION VIOLATIONS

118.    The School District re-alleges and incorporates by reference the foregoing Paragraphs 1 through 117 as if fully set forth herein.

119.    The School District and its staff and mental health professionals are engaged in constitutionally protected expression with students. The School District and its staff reasonably feared that their previous speech is now subject to the DCL's prohibition on "DEI programs" in federally funded educational institutions that has led to the termination of the grant award.

120.    While the First Amendment rights of School District employees are limited, after school hours and outside their official duties, their speech to students, on or off campus, can be protected speech.  *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–30 (2022).

121.    Defendants' efforts to penalize or suppress private speech because of its content or viewpoint, including by threatening to withhold federal funding from the School District because it hosts disfavored speech or associates with disfavored speakers, are presumptively unconstitutional.  *See Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that a government entity's "threat of invoking legal sanctions and other means of coercion" against a third party "to achieve the suppression" of disfavored speech violates the First Amendment); *accord NRA v. Vullo*, 602 U.S. 175, 190–91 (2024).

122.    The threats contained in the DCL are reinforced and articulated by the Department's "End DEI" portal, which solicits members of the public to provide "receipts of betrayal" identifying educational institutions that promote "divisive ideologies and indoctrination."  *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9.

123.    Because the School District and its employees are subject to compliance with federal law in their mental health, counseling, teaching and professional practices, the DCL also exposes them to professional and legal penalties by declaring that their protected expression violates federal law.

124.    The loss of federal funding will be devastating to the School District, which will no longer be able to maintain the quality of the education they previously provided to include mental health services and supports. For example, the School District would need to terminate

staff, discontinue programming and interventions for students, and scale back all forms of student interaction with mental health professionals.

125.    The loss of funding would have similar effects on almost any local school district receiving the grant funding.

126.    A Department investigation premised on the vague prohibitions in the DCL, in conjunction with the so-called "receipts of betrayal," would impose onerous legal, administrative, and reputational costs on the School District and its employees.

127.    To avoid these high costs, it is foreseeable that educational institutions and entities will take steps to suppress any expression that could be construed as a prohibited "DEI program." Because the DCL does not offer any guidance as to what constitutes a DEI program, any mental health counseling, curricular or even extracurricular speech at an educational institution that conceivably runs afoul of the Department's positions is at risk of being censored or penalized with the total loss of federal funding.

128.    The School District and its employees reasonably fear that their educational institution will be investigated, disciplined, or other adverse action taken against them if they continue to discuss issues subject to the DCL with students, despite the needs of the student.

129.    The School District and its employees also fear adverse action if they continue to assign readings, invite guest speakers, or engage in discussion and debate with students on anything that might be construed to fall within these prohibited categories.

130.    The DCL unconstitutionally penalizes protected speech on the basis of its content and viewpoint.

131.    As a result of Defendants' unlawful conduct, the School District has suffered and will continue to suffer irreparable harm.

## COUNT III
### FIFTH AMENDMENT – DUE PROCESS VIOLATION AND VOID FOR VAGUENESS

132.    The School District re-alleges and incorporates by reference the foregoing Paragraphs 1 through 131 as if fully set forth herein.

133.    The Fifth Amendment prohibits vagueness as "an 'essential' of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted).  The prohibition on vagueness guarantees that ordinary people have fair notice of the conduct proscribed, and guards against arbitrary and discriminatory enforcement.  *Id.*

134.    A regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This principle applies to administrative, civil, and criminal prohibitions.  *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).  And where First Amendment rights are at stake, "[t]he general test of vagueness applies with particular force."  *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976).  A regulation is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

135.    The DCL is impermissibly vague and violates the Fifth Amendment due process rights of the School District and its employees.  All of its prohibitions are unclear and undefined, overly broad in scope, and turn on subjective judgement of some individual at the Department.

136.    While the DCL asserts that "DEI programs" unlawfully "discriminate," it, however, fails to define what constitutes a "DEI program".  The DCL fails to explain how such programs constitute "preference" to certain racial groups, or provide criteria for determining the

circumstances under which educational programs in any way violate federal antidiscrimination laws.

137.    As described above, the DCL fails to provide adequate notice about what speech and programming are prohibited by federal law.

138.    The DCL's discussion of ambiguously described DEI programs also invites arbitrary and selective enforcement against educational programs that advocate views inconsistent with those espoused by the Department and the President.

139.    The DCL is vague, the School District and its employees cannot effectively alter their practices to conform with the law and are left open to arbitrary and discriminatory enforcement.

140.    As a result of Defendants' unlawful conduct, the School District has suffered and will continue to suffer irreparable harm.

## COUNT IV
### U.S. CONSTITUTION, ARTICLE I, SECTION 8, CLAUSE 1
### SUBSTANTIVE VIOLATION OF THE SPENDING CLAUSE

141.    The School District re-alleges and incorporates by reference the foregoing Paragraphs 1 through 140 as if fully set forth herein.

142.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

143.    The Spending Clause of the U.S. Constitution, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

144.    The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds to them.  *See Pennhurst*, 451 U.S. at 17, 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012).  The funding conditions must be set out "unambiguously."  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).  And the federal statute must be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal statutory] funds and the obligations that go with those funds."  *Id.*

145.    Defendants' April 29th Grant Termination Letter has altered the conditions upon which the mental health grants were obligated and disbursed to Grant Recipients, which are contrary to Congressional authority.  Defendants' April action amounts to a retroactive and ambiguous condition on mental health grant funding, prohibiting recipients from engaging in any work perceived to be related to "DEI."

146.    Defendants now assert authority to unilaterally terminate a federal grant on grounds not authorized by Congress under the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022) or 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024).

147.    Defendants' Grant Termination Letter is also contrary to the requirement that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.  *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).  Here, Defendants' actions are not related to the federal interest to provide mental health services and supports to school-aged students nationwide and in traditionally underserved areas, for hard-to-serve subjects, and for diverse populations—and instead are related to an objective of ending "diversity, equity, and inclusion" activities of any kind.

148.    Thus, the School District is entitled to equitable relief to enjoin Defendants' termination of the mental health grants mandated by the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022), and to a declaration pursuant to 28 U.S.C. § 2201 declaring the termination of the grants is unconstitutional and bar any action taken to enforce or implement the DCL regarding mental health grants.

## COUNT V
### ACTS OF THE DEFENDANTS ARE *ULTRA-VIRES*
### CONDUCT OUTSIDE THE SCOPE OF STATUTORY AUTHORITY TO THE EXECUTIVE

149.    The School District re-alleges and incorporates by reference the foregoing Paragraphs 1 through 148 as if fully set forth herein.

150.    The Department, through its officials, may exercise only the authority conferred by statute and regulations.

151.    Defendants do not have authority to eliminate grant programs based on a change in priorities after grants were issued in accordance with the Congressional authorizing statutes and the completed statutorily required notice and comment process to set final priorities. Defendants' April Grant Termination Letter is contrary to the authorizing statutes, the GEPA, and the Department's own regulations, are contrary to law and outside of Defendants' authority.

152.    To the extent Defendants terminated the mental health grants by placing new, retroactive, ambiguous, and unrelated conditions on the grants, Defendants have encroached upon Congress's Spending authority and violated the separation of powers, and thereby acted *ultra vires*.

153.    Defendants' April action has caused and is causing substantial injury, including irreparable harm.

154.    Pursuant to 28 U.S.C. § 2201, the School District is entitled to a declaration that Defendants' April action is *ultra vires* and therefore unlawful.

155.    The School District is also entitled to a permanent injunction preventing Defendants from implementing, maintaining, or reinstating the grant award under the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022).

**COUNT VI**
**ADMINISTRATIVE PROCEDURE ACT – VIOLATION OF 5 U.S.C. § 706(2)(A)**
**AGENCY ACTION IS ARBITRARY AND CAPRICIOUS AND ABUSE OF DISCRETION**

156.    The School District re-alleges and incorporates by reference the foregoing Paragraphs 1 through 155 as if fully set forth herein.

157.    The APA requires that this court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

158.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."  *Dep't of Commerce* v. *New York*, 588 U.S. 752, 785 (2019).

159.     Defendants' April Grant Termination Letter constitutes a final agency action under the APA.  The DCL forms the basis of the Defendants' action and uses it to justify its action pursuant to 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024).

160.     Regulations governing the process for grant terminations prohibit Defendants from engaging in arbitrary and capricious terminations.  *See* 2 C.F.R.§ 200.341(a) (requiring written notice of any termination, which must "include the reason for termination"); 85 Fed. Reg. 49509 (grant terminations cannot be arbitrary).

161.     Defendants' action is arbitrary and capricious because Defendants used the fiction of the DCL to undertake the undisclosed purpose of terminating a congressionally authorized and funded grant program.

162.     Defendants' action is arbitrary and capricious because the Department did not provide a transparent and reasonable explanation for the termination of the mental health grant. The Grant Termination Letter lists no specific reasons for the Department to use as the basis for terminating the grant.

163.     Defendants' action is arbitrary and capricious because Defendants failed to take into consideration the reliance interests of the School District, who has taken steps in reliance upon receiving Federal grant award meeting the requirements of Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022).

164.     Defendants' actions are arbitrary and capricious to the extent that the Department is relying on Department priorities that are contrary to the priorities the Department established through required notice-and-comment rulemaking via publication in the Federal Register.  *See* 20 U.S.C. § 1232; 34 C.F.R. § 75.105.

165.    To the extent the Department is relying on the explanation that the termination of the mental health grants effectuates a new Departmental priority to eliminate funding of DEI programs, the Defendants fail to define or identify what such programs would even involve and provides no explanation of how the grant is allegedly inconsistent with this priority.

166.    Moreover, the Department is relying on the explanation that the termination effectuates a new Departmental priority to eliminate funding of DEI and equity-related programs, that is arbitrary and capricious and an abuse of discretion.

167.    To the extent the Department is relying on a new interpretation of existing anti-discrimination laws in order to conclude that grant recipients' use of the mental health grants are a form of "DEI" that is discriminatory and unlawful, the Defendants' actions are arbitrary and capricious.  The Grant Termination Letter fails to provide "good reasons for"—any official change in agency policy "priorities."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

168.    Equally, to the extent the Department is relying on the explanation that the terminated grant conflicts with the Department's policy of prioritizing "merit, fairness, and excellence in education," the Department has never published a regulation describing or defining this policy priority as required by 20 U.S.C. § 1232(d), nor have Defendants explained how mental health grant is allegedly inconsistent with this priority.

169.    The School District is harmed by the termination of the mental health grant.

170.    The School District is entitled to an order enjoining the Defendants' final agency actions pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, declaratory relief under 28 U.S.C. § 2201 and 5 U.S.C. § 706 that Defendants' actions were arbitrary and capricious and/or an abuse of discretion in violation of the APA, and a permanent

injunction preventing Defendants from implementing, maintaining, or reinstating the mental health grants.

## COUNT VII

**ADMINISTRATIVE PROCEDURE ACT – VIOLATION OF 5 U.S.C. § 706(2)(A)**
**AGENCY ACTION IN ACCORDANCE WITH LAW UNDER 2 C.F.R. § 200.340**

171.    The School District re-alleges and incorporates by reference the foregoing Paragraphs 1 through 170 as if fully set forth herein.

172.    The Department is included in the definition of "agency" under the APA, 5 U.S.C. § 551(1), and Defendants' April 29th Grant Termination Letter is a final agency action subject to the APA.

173.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

174.    When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954).  "An agency has the duty to follow its own federal regulations," and "[f]ailure to follow applicable regulations can lead to reversal of an agency order."  *Nelson v. Immig. and Naturalization Serv.*, 232 F.3d 258, 262 (1st Cir. 2000).

175.    An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures, particularly if that error prejudices the interest of a person before the agency. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–47 (6th Cir. 2004).

176.    Defendants' Grant Termination Letter is not in accordance with the applicable law because Defendants are not authorized by the federal statutes and regulations to terminate federal grant awards on the grounds asserted in the Termination Letter.  Nor are Defendants authorized

36

to foreclose congressionally mandated grant programs under the pretext of what is or is not in the subjective interest of unnamed officials of the Federal Government.

177.    Defendants are required to comply with 2 C.F.R. § 200.340(a)(4), which only authorizes termination of a Federal grant "pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).

178.    Here, Defendants underwent notice and comment rulemaking to establish priorities, pursuant to the GEPA, 20 U.S.C. § 1232(d) and Defendants' own regulation, 34 C.F.R. § 75.105(b).  The School District relied upon these published priorities in crafting their grant applications and accepting their grant awards.  However, in furtherance of the DCL, the Grant Termination Letter sets forth new priorities without undergoing notice and comment rulemaking and purports to terminate previously-awarded mental health grants based these new priorities.

179.    Accordingly, to the extent they apply at all, the Department lacked the authority under 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) to carry out the grant termination and have violated the GEPA and their own regulations.

180.    The School District as a grant award recipient is prejudiced by this final agency action.

181.    The School District is entitled to an order barring the Department's final agency action pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, declaratory relief under 28 U.S.C. § 2201 and 5 U.S.C. § 706, in that Defendants acted contrary to law in terminating the previously-awarded mental health grant in violation of the APA, as well as a permanent injunction preventing Defendants from implementing, maintaining, or reinstating the April action against the School District.

WHEREFORE, Plaintiff prays that this Court:

A.    Declare Defendants' termination of the mental health grants unlawful;

B.    Declare that the DCL violates the First and Fifth Amendments to the United States Constitution;

C.    Declare that the DCL and termination of the mental health grant are arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to a constitutional right, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2);

D.    Declare that the DCL violates the Spending Clause of the United States Constitution;

E.    Hold unlawful, vacate, and set aside the DCL, the "End DEI" portal, and the DCL's FAQ;

F.    Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing and/or implementing the DCL;

G.    Enter a preliminary injunction and temporary restraining order (a) enjoining Defendants' enforcement of the termination of the mental health grants; (b) ordering such grant funding reinstated forthwith; (c) ordering Defendants to provide the Grant Recipients reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order; (d) enjoining Defendants' termination of any additional mental health grants if such termination would be inconsistent with the Court's order; and (e) removing the use of conditions for future agency action;

H.    Issue a permanent injunction providing the same relief;

I.    Award attorney's fees, costs, and expenses in accordance with law, including the

Equal Access to Justice Act, 28 U.S.C. § 2412; and

J.    Grant such other relief as this Court may deem just and proper.

Respectfully submitted,

HIMES, PETRARCA & FESTER, CHTD.

By:  ___/s/ Andrew M. Sanchez_____
     ANDREW M. SANCHEZ
     5051 Journal Center Blvd. NE, Suite 320
     Albuquerque, New Mexico  87109
     (505) 259-2069
     asanchez@edlawyer.com

     **ATTORNEYS FOR THE BOARD OF EDUCATION
     FOR THE SILVER CONSOLIDATED SCHOOLS**

## VERIFICATION AND ACKNOWLEDGEMENT

STATE OF NEW MEXICO   )
                             ) ss.
COUNTY OF GRANT       )

I, William Hawkins, being first duly sworn upon my oath, depose and state that I am the Deputy Superintendent for the Gallup-McKinley County Schools  in the above-entitled cause; that I have read the *VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF*; know the contents thereof, and that the matters and things therein set forth are true to my own knowledge, save where the same are or must of necessity be set forth upon information and belief, and as to those statements I believe the same to be true.

_____

WILLIAM HAWKINS, Superintendent of Schools for the Silver Consolidated Schools and agent and representative of the Board of Education for Silver Consolidated Schools

On June 20, 2025, before me personally appeared Willam Hawkins, personally known to me OR proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted executed the instrument.

Witness my hand and official seal.

_____
Signature of Notary Public

*Martha Alvarez*

_____
Printed Name of Notary Public

STATE OF NEW MEXICO
NOTARY PUBLIC
Martha A. Alvarez
Commission Number 1073222
My Commission Expires June 2, 2026

My Commission Expires:

June 2, 2026

SEAL

21