## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BOARD OF EDUCATION FOR THE
SILVER CONSOLIDATED SCHOOLS,

    Plaintiff,

v.            No. 2:25-CV-00586 WJ/GBW

LINDA MCMAHON, in her official capacity **Order Granting Leave to Exceed Page**
as Secretary of Education; U.S. DEPARTMENT **Limits Entered June 25, 2025 (Doc. 8)**
OF EDUCATION and DONALD J. TRUMP,
in his official capacity as President of the United
States of America,

    Defendants.

## MEMORANDUM BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR FOR PRELIMINARY INJUNCTION

### I.  INTRODUCTION

   The Plaintiff School District is the recipient of a $6 Million award from a federal mental health grant distributed over a five (5) year period that has been authorized and appropriated by Congress. It is part of a $1 Billion spending package and was signed into law by President Biden on June 25, 2022, known as the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022). The Bipartisan Safer Communities Act was passed by Congress in the wake of the horrific Uvalde school shooting that occurred on May 24, 2022, at Robb Elementary School in Uvalde, Texas, in which nineteen (19) elementary school students and two (2) teachers were gunned down in the deadliest school shooting in Texas history and second deadliest in the entire United States behind the school shooting at Sandy Hook Elementary School in Connecticut in 2012. *See* Fort Worth Star-Telegram, *What are the worst school shootings in America? These were 5 deadliest in Texas and US*, James Hartley, https://www.star-telegram.com/news/local/fort-worth/article261761362.html.

The Act was intended to strengthen gun purchase background checks, mental health support and school security, while still not fully addressing the call for new federal gun legislation restricting the sale and possession of firearms.  The Bipartisan Safer Communities Act expanded access to mental health services and addressed the trauma of gun violence affecting so many communities.  *See* Statement of Administration Policy, Office of Management and Budget, *S. 2938 – Bipartisan Safer Communities Act*, 2022 WL 3040260 (June 23, 2022).  Most notably, the Act expanded access to school-based behavioral health services for children and families.  *See Id.* at *1.  The Act provided funding to increase awareness of mental health issues among school-aged children, and youths; funding to train school personnel and other adults who interact with school-aged children and youths to detect and respond to mental health issues; and funding to help connect these children and youths with the care they may need.  *See Id.*  The Act also provided funding to increase the number of mental health service providers in public schools; train primary care providers and pediatric primary care providers to be able to better provide mental health care and connect patients to mental health experts; improve treatment programs for children and adults who have experienced trauma; and support implementation of the 9-8-8 Suicide and Crisis Lifeline.  *See Id.*

The Bipartisan Safer Communities Act amended the provisions of Section 330M of the Public Health Service Act, at 42 U.S.C. § 254c–19.  Section 254c–19 was amended by the Act to provide that "[t]he Secretary [of the U.S. Department of Health and Human Services], acting . . . in coordination with other relevant Federal agencies, **shall award grants** or cooperative agreements to States, political subdivisions of States, and Indian Tribes and Tribal organizations . . . to promote behavioral health integration in pediatric primary care . . . ."  42 U.S.C. § 254c–19(a) (emphasis added and internal citations removed).  Section 254c–19 was also amended to

provide the following:  "To carry out this section, there are authorized to be appropriated, $31,000,000 for each of fiscal years 2023 through 2027."  42 U.S.C. § 254c–19(h).

Congress directed the Secretary of the U.S. Department of Health and Human Services in coordination with the Secretary of the U.S. Department of Education to award the grants, on a competitive basis, to eligible entities to provide funding consistent with the goals of the Bipartisan Safer Communities Act.  It is from these provisions of law that the School District became the recipient of the federal grant which was abruptly terminated by the Defendants in April of 2025.  ". . . . the Department of Education will begin the process to disburse almost $300 million Congress appropriated in FY22 through both the Bipartisan Safer Communities Act and the FY22 Omnibus to help schools hire more school-based mental health professionals and build a strong pipeline into the profession for the upcoming school year.  In total, the Bipartisan Safer Communities Act will invest $1 billion over the next five years in mental health supports in our schools, making progress towards the President's goal to double the number of school counselors, social workers and other mental health professionals."  *Fact Sheet: Biden-Harris Administration Announces Two New Actions To Address Youth Mental Health Crisis*, 2022 WL 3010155, at *1.

On April 29, 2025, Defendant U.S. Department of Education, by and through its Office of Planning, Evaluation, and Policy terminated the grants, including the grant to the School District.  *See* Grant Termination Letter attached as <u>Exhibit A to the Complaint (Doc. 1)</u>; *see also* Affidavit of Superintendent of Schools attached as <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 5, *infra*.  The Defendant determined that the funding for the mental health grants reflected the prior Administration's priorities and policies that are not shared by the current Administration.  The Department determined that the mental health "programs: violate the letter or purpose of Federal

civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." *See id.*

Without statutory authority and in violation of the Constitution, the Defendants acted to terminate vital and necessary federal funding that had been mandated by Congress and directed to assist students and communities, and they did so without any of the necessary review or assessment of the value brought to local school districts by the grants. As a result of the Department's improper termination, the School District has been and will continue to be deprived of essential funding required to continue its mental health programs, and the continuation of the Department's unlawful terminations will irreparably harm other similarly situated school districts. As such, the School District respectfully requests that this Court award relief to address the irreparable harm that continues to result from Defendants' unlawful actions.

## II.    THE APPLICABLE LAW

### A.    DECLARATORY JUDGMENT

An actual and substantial controversy exists between the Plaintiff School District and Defendants about whether 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024) permit Defendants to terminate congressionally mandated and authorized grant programs under the pretext of determining that the continuation of mental health grants are not in the best interest of the Federal Government. This action is presently justiciable because Defendants have asserted that 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024) permits the Department, as a matter of law, to terminate awarded grants on the grounds that the Defendants determined the grants are now no longer in the interest of the Federal Government in contrast to the statutory provisions of Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313

(2022), amending the provisions of Section 330M of the Public Health Service Act, at 42 U.S.C. § 254c–19 to appropriate federal money for distribution of $1 Billion over five years as mandated in the amended statutes.

The School District maintains that the provisions of 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) only permit the termination of a federal award if the award no longer effectuates agency priorities identified as of the time of the federal award; these provisions do not independently permit or authorize such termination based on agency priorities identified or promulgated after the time of the Federal award.  The Defendants are not permitted to violate the Constitution or statutory provisions of Federal law.  The Defendants are also required to comply with the provisions of the Administrative Procedures Act in taking any and all agency actions.  Thus, declaratory relief will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. § 2201, is appropriate to resolve this controversy.

**B.    THE LAW APPLICABLE TO A TEMPORARY RESTRAINING ORDER**

This Court has been clear that "[t]he requirements for the issuance of a TRO are essentially the same as those for the issuance of a preliminary injunction.  *O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke*, 286 F. Supp. 3d 1239, 1251–52 (D.N.M. 2017), *citing Herrera v. Santa Fe Pub. Sch.*, 792 F.Supp.2d 1174, 1181 (D.N.M. 2011)(Browning, J.); 13 *Moore's Federal Practice* ¶ 65.36(1), at 65–83 (3d ed. 2004).  "The primary difference between a TRO and a preliminary injunction is that a TRO may issue without notice to the opposing party and that a TRO is of limited duration."  *O Centro Espirita*, 286 F. Supp. 3d 1239 at 52, *citing* FED. R. CIV. P. 65(b).  "The Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have explained that 'the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'"

*Id.*, quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citing *Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220 (10th Cir. 2003)("In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.")(internal citation omitted)).

In determining whether to grant injunctive relief, this Court must consider the following:

> (i) whether the moving party will suffer irreparable injury unless the injunction issues; (ii) whether there is a substantial likelihood that the moving party will eventually prevail on the merits; (iii) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) whether the injunction, if issued, would not be adverse to the public interest.

*Herrera*, 792 F.Supp.2d at 1181, *citing Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992).

### C.    THE LAW APPLICABLE TO PRELIMINARY INJUNCTIONS

In order to demonstrate that a preliminary injunction should be granted by this Court, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." *N. Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984); *see O Centro Espirita*, 286 F. Supp. 3d 1239 at 52. The movant must make the same four showings as in a TRO. *See O Centro Espirita*, 286 F. Supp. 3d 1239 at 52-53, *citing Cruce*, 972 F.2d at 1198; *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 19 (2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing *Munaf v. Geren*, 553 U.S. 674, 688–89 (2008)). "The limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *O Centro*

*Espirita*, 286 F. Supp. 3d 1239 at 53, *quoting Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005)(quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  "Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy." *Id.*, *citing De Beers Consol. Mines v. United States*, 325 U.S. 212, 219–23 (1945); *Reebok Int'l, Ltd. v. Marnatech Enter., Inc.*, 970 F.2d 552, 559–60 (9th Cir. 1992).

**D.    THE LAW APPLICABLE TO JUDICIAL REVIEW UNDER THE ADMINISTRATIVE PROCEDURES ACT AND WAIVER OF SOVEREIGN IMMUNITY**

As applied here, this "Court reviews agency actions under the APA, 5 U.S.C. §§ 701– 706.  The Administrative Procedures Act ("APA") describes the exclusive mechanism—unless another statute provides an alternative or supplemental mechanism—by which the federal district courts may review the actions of federal administrative agencies."  *O Centro Espirita*, 286 F. Supp. 3d 1239 at 54.  "The APA makes final agency action for which there is no other adequate remedy in a court subject to judicial review."  *Id.*, *quoting Utahns for Better Transp. v. United States Dep't of Transp*, 305 F.3d 1152, 1164 (10th Cir. 2002).  5 U.S.C. § 702 states in relevant part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.

"Because neither [the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022)] nor [the Public Health Service Act, at 42 U.S.C. § 254c–19] provide a private right of

action, courts review final agency action under the APA." *O Centro Espirita*, 286 F. Supp. 3d 1239 at 54, *quoting Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 740 (10th Cir. 2006).

In addition, there has been a wavier of sovereign immunity to permit this Court's judicial review in this case. "It is well established that the United States, as sovereign, is immune from suit absent a clear and express waiver by statute." *Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *18 (D. Me. Apr. 11, 2025), *citing United States v. Sherwood*, 312 U.S. 584, 586 (1941). "Until Congress has expressly and unequivocally waived the United States' sovereign immunity, actions against the United States must be dismissed for lack of subject matter jurisdiction." *Id.*, *citing United States v. United States Fid. & Guar. Co.*, 309 U.S. 506, 514 (1940). "However, an exception to the doctrine of sovereign immunity exists when the requested relief from a federal entity or official is equitable in nature." *Maine*, 2025 WL 1088946, at *18. As is the case here, the School District is seeking equitable relief and not money damages. *See Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988) (stating that Congress amended § 702 in 1976 to "broaden the avenues for judicial review of agency action be eliminating the defense of sovereign immunity" in suits "seeking relief other than money damages."). Simply put, the primary purpose in bringing Plaintiff's claims is to seek equitable, not monetary, relief. The School District does not bring claims for past pecuniary harms, but rather, like the plaintiffs in *Bowen*, the School District's claims are to preserve its ongoing relationship as a grant recipient with the Government and seeks declaratory and injunctive relief to confirm the Government's future obligations towards the School District.

There is a "distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief ...." *Bowen*, 487 U.S. at 893. "A claim for

specific relief through declaratory judgment or injunction that requires the federal government to pay money to plaintiffs does not automatically transform the action into one for money damages." *Sustainability Inst. v. Trump*, No. 2:25-CV-2152-RMG, 2025 WL 1486978, at *2 (D.S.C. Apr. 29, 2025)*, citing Bowen*, 487 U.S. at 891-92 ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages."); *Harrison v. Kendall*, 670 F.Supp.3d 280, 297 (E.D. Va. 2023) ("a suit which does not seek monetary damages does not arise under the Tucker Act simply because the plaintiff's success will result in eventual monetary gain from the government."). "Instead, 'to determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the essence of the complaint and whether the relief requested is not an incident of, or collateral to, a monetary award.'" *Id*., *quoting Coleman v. Kendall*, 74 F.4th 610, 615-16 (4th Cir. 2023), *cert denied*, 144 S. Ct. 818 (2024). Here, the School District has established that its claims are not based on contract, but instead are rooted in the Constitution and the grant's authorizing statute, and the School District's claims are about the process in which its grant was terminated, not the monetary awards in the grant itself.

Moreover, the School District's prayer for relief seeks, among other things, declaratory judgment that Defendants' actions violated the Constitution, statutory provisions enacting and appropriating funds to Plaintiff's grant program, and the APA; an injunction prohibiting Defendants from otherwise impeding, blocking, cancelling, or terminating the School District's access to their grant funds; and an order setting aside Defendants actions to freeze or terminate the grant. As such, the School District's claims do not turn on the terms of a contract between the parties, and none of the claims asserted are based on Defendants' failure to perform obligations under the terms of the grant award. More importantly, the School District is not

seeking judicial review of the grant agreement between the parties, but instead, it hereby asks the Court to review and interpret the applicable federal laws and the Constitution. Lastly, the School District's action for federal funds authorized and appropriated by Congress does not transform the action into one for money damages. The source of the rights alleged in this action is federal law—namely the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022), the Public Health Service Act, at 42 U.S.C. § 254c–19, and the Constitution—not any contractual obligations outlined in the grant award. Therefore, the Court has subject matter jurisdiction and is authorized to conduct a judicial review under the APA.

## III.    ARGUMENT

### A.    THE SCHOOL DISTRICT HAS STANDING

The School District has standing to challenge the termination of the previously-awarded grant, because they will suffer an "injury in fact" that is "fairly traceable" to the termination of the grant and "is likely to be redressed by" a judicial order enjoining implementation of the termination of the grant and in compelling its reinstatement. *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, 993 F.3d 802, 813 (10th Cir. 2021). "To sustain this burden, a plaintiff must allege it has '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.*, *quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Suffering a monetary harm is sufficiently concrete for Article III standing purposes. *See Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191 (10th Cir. 2021); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). As such, "los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). The impacts

of the Defendants' actions are set forth in <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶¶ 7-34, *infra*. Without the federal grant, the School District stands to lose millions of dollars designated by Congress for mental health programs and supports for public schools.  More importantly, the School District is simply unable to recoup the loss of funds and it will have to eliminate or drastically reduces its supports for students, staff and the community, including reducing the School District's staffing.

The Defendants are the sole and exclusive cause of this harm, which is traceable and is capable of being redressed by order of this Court.  *See N. Laramie Range All. v. FERC*, 733 F.3d 1030, 1035 (10th Cir. 2013) (the harm must be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.") (cleaned up and internal citations removed).  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  In addition, the harm suffered by the School District can be redressed by this Court. *See Lujan,* 504 U.S. at 560.   Here, the School District, through favorable ruling, seeks declaratory and injunctive relief to redress the harm caused by Defendants, satisfying all the requirements of standing.  *See Valdez v. Grisham*, 2024 WL 2319752, at *4 (10th Cir. May 22, 2024).

### B.    DEFENDANTS' ACTIONS AND OMISSIONS

Since taking office in January, President Trump has issued a staggering number of executive orders some which prohibit federal agencies from supporting any and all initiatives relating or pertaining to social policies that he opposed during his political campaigns, including "diversity, equity, and inclusion" or "DEI."   In the first two days of President Trump's new administration, the President issued two Executive Orders addressing diversity, equity, and inclusion.   The January 20, 2025 Order ("J20 Order"), titled "Ending Radical and Wasteful

Government DEI Programs and Preferencing," focused on ending DEI programs within the federal government.  *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1.  The January 21, 2025 Order ("J21 Order") titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," focused on "enforcing civil rights laws" by "ending illegal preferences and discrimination" in both the federal government and the private sector.  *See* Exec. Order No. 14173, 90 Fed. Reg. 8633, § 1.  On January 29, 2025, President Trump issued Executive Order No. 14190 "Ending Radical Indoctrination in K-12 Schooling,"  90 Fed. Reg. 8853 (Feb. 3, 2025).  The Executive Order requires the Secretary of Education, Secretary of Defense, and Secretary of Health and Human Services, in consultation with the Attorney General, to develop a plan for "eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology" within 90 days from the date of the Executive Order.  *Id.* at § 3(a)(i).  However, these executive orders fail to define some of the key terms they include, such as "equity-related," "programs promoting DEI," "illegal DEI," and "DEIA principles."

In carrying out the President's executive orders, Defendants issued a Directive conditioning the provision of federal monies entitled "Eliminating Discrimination and Fraud in Department Grant Awards" on February 5, 2025.  The Directive was intended, in part, to terminate previously awarded grants by the previous Administration with any subjectively perceived relationship to the prohibited topic of "DEI."  The Directive instructs the Department's officials to review all new and ongoing grants and all notices of funding opportunities and eliminate them if they run afoul of any one of five different prohibitions, which include "DEI" that is contrary to "the Department's policy objectives."  On February 14, 2025, the Department, by and through its Acting Assistant Secretary for Civil Rights, issued a Dear Colleague Letter

("DCL") threatening schools and colleges across the country with the loss of federal funding if these education institutions continued to pursue ambiguously defined "DEI programs" that "teach students that certain racial groups bear unique moral burdens that others do not" and/or "stigmatize students who belong to racial groups." *See* DCL attached as <u>Exhibit A to the Complaint (Doc. 1)</u>. The DCL purports to address the Department's new interpretation of "Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the United States Constitution, and other relevant authorities." <u>Exhibit A to the Complaint (Doc. 1)</u> at 1. It applies to "schools," encompassing "preschool, elementary, secondary, and postsecondary educational institutions that receive federal financial assistance from the Department." *Id.* at n.1.

The DCL shifted longstanding enforcement positions by the Department on federal civil rights laws that previously guaranteed equality and inclusion in schools, but now acts to impermissibly infringe upon the authority of the states and local school districts to govern public education, as well as infringe upon the First Amendment rights of educators and students. Although styled as a traditional technical support and guidance document, this DCL does not operate as any other Dear Colleague Letter.[1] The DCL concluded immediately in the form of all-encompassing conclusions that all schools are engaged in discrimination and then, without legal or factual support, announces new rules identifying categories of unlawful activity, invites complaints, and issues a deadline before the Department will take "appropriate measures." <u>Exhibit A to the Complaint (Doc. 1)</u> at 3.

---

[1] Prior to this Administration, Dear Colleague Letters provided guidance and statutory interpretation within the scope of Department's proper authority as identified and explained in the language of the law as written by Congress and interpreted in federal court decisions, assessed relevant data and other factual information, and provided additional guidance regarding how the Department will apply the established law to factual circumstances in the course of its investigations and enforcement actions. *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT; U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug.14, 2023), https://perma.cc/V7Z6-XMCM; U.S. Dep't of Educ., Off. of the Undersec'y, Strategies for Increasing Diversity and Opportunity in Higher Education, https://perma.cc/52W4-XJFR.

Contrary to civil rights laws over the last 60 years and the federal education laws, regulations, guidance, and court interpretations of the laws, the DCL pronounced the Department's position that any equity, diversity or inclusion programming is now unlawful.  The DCL also announced that that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism'" and has "advanced discriminatory policies and practices"; and that schools have used "'diversity, equity, and inclusion' ('DEI')," as a means of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline."  Exhibit A to the Complaint (Doc. 1) at 1–2.  The DCL is unencumbered by the results of any conducted investigation(s), sampling of court cases and their rationale, student or instructional data or any scholarly research on the topic.  The DCL does not even attempt to explain the Department's own reasoning and justification for its declarations and change from previous positions.  The DCL provides no guidance that would help any school to understand how the Department would apply existing legal precedent that is clearly contrary to its conclusions based on the facts of any particular case.  Most significantly, the DCL provides no definitions of key terms or of the practices that the Department now deems discriminatory, including a definition of "diversity," "equity," or "inclusion."

The DCL promulgates new rules finding that "DEI programs . . . deny students the ability to participate fully in the life of a school."  Exhibit A to the Complaint (Doc. 1) at 3.  The Department fails to provide any support for its pronouncement that these actions are, as a matter of law, unlawful.  Two weeks after the issuance of the DCL, the Department issued a document titled, *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* ("FAQ").[2]  In this document, the Department denounced the dangers of DEI

---

[2]  U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-

and asserted that schools "have sought to veil discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching." *Id.* at 6.   However, DCL is not only unconstitutionally vague; it also encroaches upon teaching and academic freedom recognized by Congress and the courts, and these prohibitions on federal intrusion into curriculum, instruction, and materials are longstanding within federal law.

With regard to K-12 education that is provided by the states and their subdivisions, Congress expressly prohibited the Department from involvement in local curricular decisions. Under the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act ("ESSA"), 20 U.S.C. §§ 6301–7981, which is the primary federal statute governing K-12 education funding, the statute establishes a formula for funding and for competitive grants to the states, local education agencies, schools, non-profits, and institutes of higher education "to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational opportunity gaps." *Id.* § 6301.   However, ESSA explicitly prohibits the Federal Government from interfering with states' curriculums, instructional content, and related activities across all of its titles involving federal grants. *See, e.g.*, *id.* § 7906a; *id.* § 7907(b) ("Notwithstanding any other provision of Federal law, no funds provided to the Department [of Education] under this chapter may be used by the Department, whether through a grant, contract, or cooperative agreement, to endorse, approve, develop, require, or sanction any curriculum . . . designed to be used in an elementary school or secondary school.");   *id.* § 7907(c)(1) ("Nothing in this section shall be construed to—(1) authorize an officer or employee of the Federal Government, whether through a grant, contract, or cooperative agreement to mandate, direct, review, or control a State, local educational agency, or school's instructional content, curriculum, and related activities.").

preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf ("FAQ").

The General Education Provisions Act ("GEPA"), 20 U.S.C. §§ 1221–1234i, governs the administration of all federal education programs. GEPA prohibits the federal government from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system." *Id.* § 1232a. In addition, the Department of Education Organization Act ("DEOA"), 20 U.S.C. §§ 3401–3510, which established the Department in 1979, similarly prohibits the Department from exercising "direction, supervision, or control" over a range of activities, including "over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." *Id.* § 3403(b).

In declaring these education practices unlawful and as justification for withholding federal funds, the Department has not just encroached upon the purview of the courts to rule on what the law is, it has exceeded the scope of the statutes by which it is controlled. The Department has issued new rules and is simply ignoring its own prior guidance and interpretation of the law and fails to provide any explanation whatsoever for its complete reversal in position. The DCL also ignores its own prior publications provided as guidance and directives. *See* Note 1. The DCL fails to acknowledge or support the rationale of the Department in changing its position. *See FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency must "display awareness that it is changing position" (emphasis omitted)). As a result, various district courts have granted preliminary injunctions to enjoin enforcement of the Department's DCL and FAQ, undertaken in furtherance of the Executive Orders, based on the

likelihood that these actions are unlawful. *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, No. 25-CV-1120 (DLF), 2025 WL 1196212, at *7 (D.D.C. Apr. 24, 2025) (preliminarily enjoining enforcement of the DCL's certification requirement based on likelihood of success on constitutional vagueness claim); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, No. 25-CV-091-LM, 2025 WL 1188160, at *32 (D.N.H. Apr. 24, 2025) (preliminarily enjoining enforcement of the DCL ); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 2025 WL 1191844, at *24 (D. Md. Apr. 24, 2025) (staying enforcement of the DCL under the APA pending final resolution based the plaintiffs' showing of a likelihood of success on the merits of their APA claim).

The School District has not had the opportunity to knowingly accept or reject the federal funds based on the new rules from the Department since they appear to be actions taken by an agency without the requisite support in law or fact. What is clear, however, it that the School District cannot continue to deliver the quality of instruction, programming, student supports and professional development that its students and school community deserves without federal funds. Educators and school districts across the country, including the Plaintiff School District have invested in their educational practices to be in compliance with federal law, including in their own training and professional development, and in designing their courses, student supports and curriculum. Indeed, laws, regulations, and other guidance and interpretation address the provision of equal educational opportunity and inclusion in many ways, including for students on the basis of race, ethnicity, national origin, sex, and for students with disabilities, English learners, and students experiencing homelessness.[3]

---

[3] *See, e.g.*, the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq*.), the Rehabilitation Act of 1973 (20 U.S.C. § 701 *et seq*.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. § 2301 *et seq*.), the Workforce Innovation and Opportunity Act (29 U.S.C. § 3101 *et seq*.), the Head Start Act (42 U.S.C. § 9831 *et seq*.), the Child Care and Development Block Grant Act of 1990 (42 U.S.C. § 9858 *et seq*.), the Education

The DCL promulgates new and unsupported requirements on local school districts without providing any opportunity for the school districts to prepare and plan to incorporate these new rules from the Department.  It is further complicated by the fact that the DCL's new requirements are in conflict with federal law and contrary to many of the professional requirements and best practices for providing an appropriate education to students.

The Department uses the DCL to promulgate substantive rules and obligations upon local school districts under the threat to vigorously enforce them without proceeding through the notice and comment process required specifically by Congress in the Administrative Procedures Act ("APA"), 5 U.S.C. § 553.  While the DCL invites comments in a footnote, it is clear that the Department is aware of the requirements of notice-and-comment rulemaking, including the use of the Federal Register, but the Department makes no attempt to follow the established procedures for such formal rulemaking.  *See* <u>Exhibit A to the Complaint (Doc. 1)</u> at 1 n.3. Section 553 of the APA requires that notice and comment be solicited from the public and stakeholders before "not less than 30 days before [the rule's] effective date."  5 U.S.C. § 553(d).

While the DCL's requirements on local school districts are ambiguous, the Department's threat to enforce them are crystal clear.  The DCL states that the Department "intended to take appropriate measures to assess compliance with the applicable statues and regulations based on the understanding embodied in this letter beginning no later than 14 days from today's date," that being February 28, 2025. *See* <u>Exhibit A to the Complaint (Doc. 1)</u> at 3.  The language of the DCL is phrased as specific directives to all educational institutions receiving federal funds.  The DCL communicates to schools that enforcement action is coming swiftly, within 14 days, based on the

---

Sciences Reform Act of 2002 (20 U.S.C. § 9501 *et seq.*), the Education Act of 2002 (20 U.S.C. § 9601 *et. seq.*), the National Assessment of Educational Progress Authorization Act (20 U.S.C. § 9621 *et seq.*), the McKinney-Vento Homeless Assistance Act (42 U.S.C. § 11301 *et seq.*), and the Adult Education and Family Literacy Act (29 U.S.C. § 3271 *et seq.*).

DCL having already determined that all the schools are in violation and that the schools are directed to "cease all efforts" to violate the law as the Department perceives it in the DCL.

Following the issuance of the DCL, the Department established an "End DEI" complaint portal for "parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in" schools. *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9. The "End DEI" complaint form invites only specific complaints and does not provide an avenue for filing other civil rights complaints within the Department's jurisdiction. *See* U.S. Dep't of Educ., End DEI Portal, https://perma.cc/GYS3-J2GR. Instead, the Department solicits complaints focused on the communication of ideas that the Department and the President disfavors and subjectively describes them as "divisive ideologies and indoctrination." *See id.* The DCL also pressures "[a]nyone" who "believes" that a school has engaged in activities covered by the DCL to file a complaint with the Department and provides a link to its online complaint form. *See* Exhibit A to the Complaint (Doc. 1) at 4. The "End DEI" portal is also focused on receiving complaints on "divisive ideologies and indoctrination". *Id.* It solicits complainants to identify the specific schools or school districts and to detail "concerning practices," and the portal indicates that the Department "will use submissions as a guide to identify potential areas for investigation." *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9.

The Department fails to provide the public or the schools that are under its jurisdiction an explanation of the portal's objective, but it has relinquished this exclusive agency space to a private individual, identified as a co-founder of the political and advocacy organization entitled

*Moms for Liberty*, which generally makes unsupported claims about schools "pushing critical theory, rogue sex education and divisive ideologies" and encourages parents to use the portal "to share the receipts of the betrayal that has happened in our public schools" through "pushing critical theory, rogue sex education and divisive ideologies."  *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9.  The Department announced abandonment of its agency function to the organization *Moms for Liberty* in its press release announcing the "End DEI" portal, which demonstrates the chilling effect of the Department's actions and omissions.

On February 15, 2025, *Moms for Liberty* characterized the DCL informing the departments of education of all 50 states that "they have 14 days to eliminate all Diversity, Equity, and Inclusion (DEI) programs in their public schools," and that "NO MORE Tax Payer Dollars will be spent on DEI!"  *See Moms for Liberty*, DEAR COLLEAGUE, Facebook (Feb. 15, 2025), https://www.facebook.com/story.php?story_fbid=935218675478809&id=100069720560290.

The characterization of grant-funded programming that the Department would review depends entirely on subjective judgments and incorporates the same types of vague terms and discriminatory viewpoint prohibitions that have been found constitutionally suspect in other civil rights laws.  Courts analyzing similar prohibitions have found this vague language would prohibit educators from describing or identifying discriminatory beliefs in an orientation or course, or assigning a reading or work in which an author describes or identifies discriminatory beliefs, like how current stereotypes about race may affect the opportunities of historically marginalized groups.  *See Loc. 8027 v. Edelblut*, 2024 WL 2722254 (D.N.H. May 28, 2024)

(appeal filed); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1149 (W.D. Okla. 2024).

On April 29, 2025, the Department terminated the federal grants mandated under the Bipartisan Safer Communities Act, including the grants awarded to the School District. *See* Grant Termination Letter attached as <u>Exhibit B to the Complaint (Doc. 1)</u>; *see also* Affidavit of Superintendent of Schools attached as <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 5, *infra*. In terminating the School District's grant, the Department determined that the funding for the mental health grants reflected the prior Administration's priorities and policies are not shared by the current Administration. The Department purportedly determined that the mental health "programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." *See* <u>Exhibit B to the Complaint (Doc. 1)</u>. Without statutory authority and in violation of the Constitution and the APA, the Defendants acted to terminate vital and necessary federal funding mandated by Congress directed to assist students and communities, and they did so without any necessary review or assessment of the value brought to local school districts by the grants. In addition, the April 29, 2025 Termination Letter constitutes an unlawful final agency action under the APA.

Congress directed the Secretary of the U.S. Department of Health and Human Services in coordination with the Secretary of the Department of Education to award the grants on a competitive basis to eligible entities to provide funding consistent with the goals of Bipartisan Safer Communities Act. *See* 42 U.S.C. § 254c–19(a). There are already Federal regulations that govern the procedures and the basis by which a Federal agency, such as the Department, may

terminate a Federal grant award.  *See* 85 F.R. 49506-49582.  A Federal award may be terminated by the Federal agency if the agency determines that continuation of grant is in the best interest of the Federal Government.  34 C.F.R. § 75.253(a)(5) (2024) and/or § 75.253(f)(1) (2024).

The Department is required to publish agency Priorities in the *Federal Register*, which must be used to select the Priorities for a competition and must have gone through public comment, unless one of the following exceptions apply:

a. The final annual priorities will be implemented only by inviting applications that meet the priorities;

b. The final annual priorities are chosen from a list of priorities already established in the program's regulations;

c. Publishing proposed annual priorities would seriously interfere with an orderly, responsible grant award process or would otherwise be impracticable, unnecessary, or contrary to the public interest;

d. The program statute requires or authorizes the Secretary to establish specified priorities; or

e. The annual priorities are chosen from allowable activities specified in the program statute.

34 C.F.R. § 75.105(b)(2); 20 USC § 1232(d).  The Department is also required to establish the specific Priorities that are included in the application for each competitive federal grant program, by publishing the Priorities in the Notice Inviting Applications for the grant in the *Federal Register*.  *See* 34 C.F.R. § 75.105(b)(1).

The Department has a unique statutory requirement it must also follow for setting agency Priorities for discretionary grants.  While the Administrative Procedures Act (5 U.S.C. § 553) ("APA") exempts grants from the rulemaking process, the General Education Provisions Act (20 U.S.C. § 1232(d)) ("GEPA") states that, for the Department of Education, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition

under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program.  Simply put, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process, unless one of the above exceptions apply.  The Department followed these requirements in 2022, and Grant Recipients, including the School District, were selected to receive funding from the Department for the entire five-year period allowed under the Bipartisan Safer Communities Act.

The School District received a Grant Award Notification ("GAN") from the Department's grant management system.  GANs are an official notification relating to a grant award.  Per the Department, "[t]he GAN is the official document that states the terms, conditions, and amount of an award, and is signed by the official who is authorized to obligate funds on behalf of ED."  *See* Dep't of Educ., *Grantmaking at ED — Answers to Your Questions About the Discretionary Grants Process* 29 (2024), https://tinyurl.com/ycycf85x (hereinafter "*Grantmaking at ED*").

The Department has adopted the U.S. Office of Management Budget ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance")[4] through its own regulations, including the Uniform Guidance's Remedies for Noncompliance.  *See* 2 C.F.R. §§ 200.339–343. *See also* 2 C.F.R. § 3474.1.  The Uniform Guidance provides several procedural safeguards that protect the interests of Federal grant recipients from ambiguous, vague, or shifting requirements, including before the termination of any award.  The Uniform Guidance includes a requirement that grant terminations for a failure to "effectuate[] the program goals or agency priorities" be "pursuant to the terms and conditions of the federal award" and only "to the extent authorized by law."  2 C.F.R.

---

[4]  The Uniform Guidance was amended on April 22, 2024, and made effective on October 1, 2024.  *See Guidance for Federal Assistance*, 89 Fed. Reg. 30046 (April 22, 2024).

§ 200.340(a)(4).  The Uniform Guidance, consistent with the Constitution's Spending Clause, additionally requires that a Federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the federal award."  2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30089 (underscoring the need for agencies "to clearly and unambiguously communicate termination conditions in the terms and conditions of the award").  Federal grant recipients are also protected from sudden terminations of grants by the Department's policy, and the policy of the Uniform Guidance, to first provide assistance to noncompliant grant recipients before implementing suspension or termination. "If, in the course of monitoring, ED's staff identify areas of weakness or noncompliance, discover that the grantee is not making substantial progress, or have suggestions for how the grantee might better achieve the program objectives, [ED personnel] will provide technical assistance to help bring the project back on track. Unresolved monitoring findings can result in such actions as additional grant terms and conditions, recovery of funds, a decision to not award a continuation grant, or the termination of a grant." *Grantmaking at ED*, *supra* note 18, at 37.  Finally, if the Department is unable to bring a grant-funded program into compliance and a grant is terminated, the Uniform Guidance provides the recipient with a fair opportunity to object by requiring that the Department "must provide written notice of termination to the recipient," that "include[s] the reason for termination," and that the Department "maintain written procedures for processing objections, hearings, and appeals."  2 C.F.R. §§ 200.341(a), 200.342; *see also* 85 Fed. Reg. 49509 (OMB stating that "agencies are not able to terminate grants arbitrarily").  Here, the Department published written federal grant termination appeal procedures for the first time on February 7, 2025, a week prior to the termination of the mental health grants.

Although the Termination Letter provides that the School District can seek reconsideration within 30 days, it does not disclose how the Department will process any such request or objections or appeals and whether or how any hearings will be held. *See* U.S. Dep't of Educ., *Grant Termination Appeal Procedures* (February 2025) at https://tinyurl.com/3xpr6rvy. The terms and conditions set forth in the GAN to the School District as a grant recipient states that the Uniform Guidance, 2 C.F.R. part 200, applies as applicable. However, the Grant Termination Letter of April 29, 2025, cites to no authority that would permit the wholesale elimination of Federal grant programs established and funded by Congress. Moreover, the Grant Termination Letter does not set forth any evidence that the School District's grant award resulted in any action or omission by the School District related to the activities listed as causes for termination in the Termination Letter nor does the Termination Letter describe any specific facts about the School District's use of the grant funds that the Department found to be objectionable, much less illegal.

The unlawful agency action at issue here has resulted in irreparable harm to the School District and its students and its community. The April termination of the mental health grants effectively terminates all of the School District's mental health programs and does so nationwide.

C.    IRREPARABLE HARM TO THE SCHOOL DISTRICT

The illegal actions of the Defendants have and will continue to disrupt mental health and student support services and destabilize local school systems' ability to maintain greater school security and foster student mental health wellness. The School District has and will receive $3,605,500 of the grant monies through December 2025, and, pursuant to the grant award, it is entitled to $2,394,500 through 2027. *See* Affidavit of Superintendent of Schools attached as Exhibit C to the Complaint (Doc. 1) at ¶ 4. Prior to the grant provided by the Bipartisan Safer

Communities Act, the School District had only 19 mental health providers to serve the entire School District's population of approximately 2,500 students.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 7.  This resulted in a student-to-provider ratio of 1 mental health provider-to-108 students.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 8.  Following the award of the grant, the School District was able to fund the hiring of seven (7) additional mental health professionals with six (6) being licensed professionals, one (1) being an intern, one (1) being mental health support staff.  The School District was also able to contract with two (2) community mental health contractors to provide services.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 9.  This resulted in an improved student-to-provider ratio of 1 mental health provider-to-75 students.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 10.  As such, the termination of the Federal grant at issue in this case will result in the loss of all grant-funded mental health positions reverting the School District to its pre-grant levels of student support and eliminate all crisis and all on-demand mental health counseling at the School District.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 11.

The Federal grants funds allowed the School District to establish wellness rooms[5] at its schools.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 12.  During the grant award period, there were 7,725 student visits to the wellness rooms across all of the School District's campuses.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 13.  In the 2024-2025 school year, 830 students or 40% of total School District enrollment received mental health services within the wellness rooms.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 14.  Of all the students visiting a wellness room, in school year 2024-2025, 75% of the students reported improved well-being after their visit.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 15.  The School District reported over 20 staff members

---

[5]  A wellness room is a dedicated space in schools where students and staff can go to take a break, practice self-care, and reduce stress and anxiety.  It has been seen to reduce crisis situations with students and staff.

engagements with grant-funded supports such as coaching and counseling.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 16.  Upon termination of the grant funding, all of the wellness rooms are in substantial risk of closure, which would eliminate a proven mental health support space and services used by nearly 50% of students.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 17.

The School District reports that grant-funded mental health supports have reduced reports of bullying by nearly 30% across the School District in the last two school years.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 18.  Disruptive behavior incidents at the high school have reduced from 189 incidents in the 2022-23 school year to 89 this school year (2024-2025).  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 19.  Out-of-school suspensions were reduced by 33% across the School District over the last two school years.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 20. Reports of bullying at the middle school were reduced from 16 reports to 6 reports over the last two school years.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 21.  Disruptive behavior incidents at the middle school have reduced from 61 incidents in the to 25 this school year (2024-2025).  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 22.

The grant award also funded the acquisition and use of a mobile phone app by students for mental health wellness.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 23.  During the pilot semester, the App was used for 107.8 hours by 483 students with 677 activities being completed on the App that semester.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 24.  After the School District expanded use of the App from July-December of 2024, the App was used for 288 hours by 304 students with 4,896 activities being completed on the App.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 25.  The top reported issues by students on the App are test anxiety, academic stress, procrastination and emotional regulation.  *See* Exhibit C to the Complaint (Doc. 1) at ¶ 26.

The loss of the grant will result in the loss of 24 hour/7 days a week mental health support through the digital App for approximately 800 students who may not be willing to seek mental health support in-person or in the wellness rooms.  *See* <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 27.  The grant award also allowed the School District to provide stipends for staff for mentoring of students and staff and to lead efforts to create an inviting culture for staff and for students.  *See* <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 28.

The loss of the grant monies will result in the collapse of staff culture due to the loss of coordinator stipends, materials and event funding for mental health supports.  *See* <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 29.  The grant also funded webinars focused on parent mental health resources in both English and in Spanish that had 407 views.  *See* <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 30.

The School District also used the grant funding for Father Support Circles and kinship caregiver workshops for grandparents and other family members raising their kin.  *See* <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 31.  The loss of the grant award will eliminate the School District's first ever comprehensive family mental health outreach programs.  *See* <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 32.  The grant award allowed the School District to create and maintain a pipeline for community members to become mental health providers by allowing internships supervised by a licensed mental health provider and to provide staff trainings to expand opportunities in mental health within the community.  *See* <u>Exhibit C to the Complaint (Doc. 1)</u> at ¶ 33.  The immediate irreparable harm suffered by the School District includes but is not limited to:

    a.  Over 2,000 students will lose direct, personal access to trusted mental health support;

    b.  School District-wide student behavior and security gains will be jeopardized and lost;

   c.  Family mental health engagement will vanish;

   d.  Rural educator mental health support will be eliminated; and

   e.  A nationally recognized model for rural student well-being will be dismantled and lost.

*See* Exhibit C to the Complaint (Doc. 1) at ¶ 34.  Without relief from this Court, the School District has suffered, and will continue to suffer, immediate and irreparable harm through the complete loss of federal grant funding. *See, e.g., Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 363 (D.N.H. 2024) (citing *Tex. Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (where the public defendant is protected from damages claims, unrecoverable funding may constitute irreparable harm)).  In addition, the summary termination of grant funding effective immediately on April 29, 2025, has and will continue to cause operational burdens on the School District and its employees.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.")); *Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902, 932 (D. Kan. 2024) (same); *see also City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities constitute irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same).

### D.    FIRST AMENDMENT – FREE SPEECH AND FREE ASSOCIATION VIOLATIONS AND A SUBSTANTIAL LIKELIHOOD TO EVENTUALLY PREVAIL ON THE MERITS

The School District and its staff and mental health professionals are engaged in constitutionally protected expression with students.  The School District and its staff reasonably fear that their previous speech is now subject to the DCL's prohibition on "DEI programs" in federally-funded educational institutions that has led to the termination of the grant award. While the First Amendment rights of School District employees are limited, after school hours

and outside their official duties, their speech to students, on or off campus, can be protected speech. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–30 (2022). Here, Defendants' efforts to penalize or suppress private speech because of its content or viewpoint, including by threatening to withhold federal funding from the School District because it hosts disfavored speech or associates with disfavored speakers, are presumptively unconstitutional. *See Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that a government entity's "threat of invoking legal sanctions and other means of coercion" against a third party "to achieve the suppression" of disfavored speech violates the First Amendment); *accord NRA v. Vullo*, 602 U.S. 175, 190–91 (2024). Even in this context, viewpoint retaliation amounts to something akin to the impermissible "scheme of informal censorship" that arises when government actors use the "threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech." *Vullo*, 602 U.S. at 188–89. "Such threats present an especially harmful sort of retaliation, analogous to (though less absolute than) the prior restraints that are "the most serious and the least tolerable" of all First Amendment violations." *Jenner & Block LLP v. U.S. Dep't of Just.*, No. CV 25-916 (JDB), 2025 WL 1482021, at *8 (D.D.C. May 23, 2025), *quoting Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

The threats contained in the DCL are reinforced and articulated by the Department's "End DEI" portal, which solicits members of the public to provide "receipts of betrayal" identifying educational institutions that promote "divisive ideologies and indoctrination." *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025), https://perma.cc/8737-NAA9. Because the School District and its employees are subject to compliance with federal law in their mental health counseling, teaching and professional practices, the DCL also exposes them to professional and legal penalties by declaring that their

protected expression violates federal law. The loss of federal funding will be devastating to the School District, which will no longer be able to maintain the quality of the education they previously provided to include mental health services and supports. For example, the School District would need to terminate staff, discontinue programming and interventions for students, and scale back all forms of student interaction with mental health professionals. The loss of funding would have similar effects on any local school district receiving the grant funding.

A Department investigation premised on the vague prohibitions in the DCL, in conjunction with the so-called "receipts of betrayal," would impose onerous legal, administrative, and reputational costs on the School District and its employees. To avoid these high costs, it is foreseeable that educational institutions and entities will take steps to suppress any expression that could be construed as a prohibited "DEI program." Because the DCL does not offer any guidance as to what constitutes a "DEI program", any mental health counseling, curricular or even extracurricular speech at an educational institution that conceivably runs afoul of the Department's positions is at risk of being censored or penalized with the total loss of federal funding. The School District and its employees reasonably fear that their educational institution will be investigated, disciplined, or other adverse action taken against them if they continue to discuss with students issues subject to the DCL, despite the needs of the student. The School District and its employees also fear adverse action if they continue to assign readings, invite guest speakers, or engage in discussion and debate with students on anything that might be construed to fall within these prohibited categories. As such, the DCL unconstitutionally penalizes protected speech on the basis of its content and viewpoint, and as a result of Defendants' unlawful conduct, the School District has suffered and will continue to suffer

irreparable harm.   More importantly, the School District also establishes that it is has a substantial likelihood that it will eventually prevail on the merits.

### E.    FIFTH AMENDMENT – DUE PROCESS VIOLATION AND VOID FOR VAGUENESS, AND A SUBSTANTIAL LIKELIHOOD TO EVENTUALLY PREVAIL ON THE MERITS

The Fifth Amendment prohibits vagueness as "an 'essential' of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted).   The prohibition on vagueness guarantees that ordinary people have fair notice of the conduct proscribed, and guards against arbitrary and discriminatory enforcement. *Id.*   A regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).   This principle applies to administrative, civil, and criminal prohibitions. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).   And where First Amendment rights are at stake, "[t]he general test of vagueness applies with particular force." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976). A regulation is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).   "[T]he Due Process Clause disallows any regulation that 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or that is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Fabrizius v. Dep't of Agric.*, 129 F.4th 1226, 1237 (10th Cir. 2025), *quoting Fox Television Stations*, 567 U.S. at 253.   Here, the DCL is impermissibly vague and violates the Fifth Amendment due process rights of the School District and its employees.

All of the DCL's prohibitions are unclear and undefined, overly broad in scope, and turn on subjective judgement of some individual at the Department. While the DCL asserts that "DEI programs" unlawfully "discriminate," it, however, fails to define what constitutes a "DEI program". The DCL fails to explain how such programs constitute "preference" to certain racial groups, or provide criteria for determining the circumstances under which educational programs in any way violate federal anti-discrimination laws. As described above, the DCL fails to provide adequate notice about what speech and programming are prohibited by federal law. The DCL's discussion of ambiguously described DEI programs also invites arbitrary and selective enforcement against educational programs that advocate views inconsistent with those espoused by the current Department and the current President. The DCL is vague, the School District and its employees cannot effectively alter their practices to conform with the law and are left open to arbitrary and discriminatory enforcement. As a result of Defendants' unlawful conduct, the School District has suffered and will continue to suffer irreparable harm. More importantly, the School District also establishes that it is has a substantial likelihood that it will eventually prevail on the merits.

F.   **U.S. CONSTITUTION, ARTICLE I, SECTION 8, CLAUSE 1 - SUBSTANTIVE VIOLATION OF THE SPENDING CLAUSE, AND A SUBSTANTIAL LIKELIHOOD TO EVENTUALLY PREVAIL ON THE MERITS**

Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Spending Clause of the U.S. Constitution, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the conditions

that apply to the disbursement of funds to them.  *See Pennhurst*, 451 U.S. at 17, 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012).  The funding conditions must be set out "unambiguously."  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).  And the federal statute must be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal statutory] funds and the obligations that go with those funds."  *Id.*

Defendants' April 29th Grant Termination Letter has altered the conditions upon which the mental health grants were obligated and disbursed to Grant Recipients, which is contrary to Congressional authority.  Defendants' April termination action amounts to a retroactive and ambiguous condition on mental health grant funding, prohibiting recipients from engaging in any work perceived to be related to "DEI."  Defendants now assert authority to unilaterally terminate a federal grant on grounds not authorized by Congress under the Bipartisan Safer Communities Act, Pub. L. 117–159, 163 Stat. 1313 (2022) or 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024).  Defendants' Grant Termination Letter is also contrary to the requirement that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.  *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).  Here, Defendants' actions are not related to the federal interest to provide mental health services and supports to school-aged students nationwide and in traditionally underserved areas, for hard-to-serve subjects, and for diverse populations—and instead are related to an objective of ending "diversity, equity, and inclusion" activities of any kind.  Thus, the School District is entitled to equitable relief to enjoin Defendants' termination of the mental health grants mandated by the Bipartisan Safer Communities Act, and to a declaration pursuant to 28 U.S.C. § 2201 declaring the termination of the grants is unconstitutional and bar any action taken to

enforce or implement the DCL regarding mental health grants.  More importantly, the School District also establishes that it is has a substantial likelihood that it will eventually prevail on the merits.

### G.    ACTS OF THE DEFENDANTS ARE *ULTRA-VIRES* AS CONDUCT OUTSIDE THE SCOPE OF STATUTORY AUTHORITY TO THE EXECUTIVE, AND A SUBSTANTIAL LIKELIHOOD TO EVENTUALLY PREVAIL ON THE MERITS

The Department, through its officials, may exercise only the authority conferred by statute and regulations.  Defendants do not have authority to eliminate ongoing grant programs based on a change in priorities after grants were issued in accordance with the Congressional authorizing statutes and the completed statutorily required notice and comment process to set final priorities.  Defendants' April Grant Termination Letter is contrary to the authorizing statutes, the GEPA, and the Department's own regulations, are contrary to law and outside of Defendants' authority.  To the extent Defendants terminated the mental health grants by placing new, retroactive, ambiguous, and unrelated conditions on the grants, Defendants have encroached upon Congress's Spending authority and violated the separation of powers, and thereby acted *ultra vires*.

Defendants' April action has caused and is causing substantial injury, including irreparable harm.  Pursuant to 28 U.S.C. § 2201, the School District is entitled to a declaration that Defendants' April termination action is *ultra vires* and therefore unlawful.  The School District is also entitled to a permanent injunction preventing Defendants from terminating, pausing, freezing, impeding blocking or cancelling any grant awarded under the Bipartisan Safer Communities Act.  More importantly, the School District also establishes that it is has a substantial likelihood that it will eventually prevail on the merits.

**H.    ADMINISTRATIVE PROCEDURES ACT – VIOLATION OF 5 U.S.C. § 706(2)(A), AND A SUBSTANTIAL LIKELIHOOD TO EVENTUALLY PREVAIL ON THE MERITS - AGENCY ACTION IS ARBITRARY AND CAPRICIOUS AND ABUSE OF DISCRETION**

The APA requires that this Court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."  *Dep't of Commerce* v. *New York*, 588 U.S. 752, 785 (2019).  Here, Defendants' April Grant Termination Letter constitutes a final agency action under the APA.

The DCL forms the basis of the Defendants' action and uses it to justify its action pursuant to 34 C.F.R. § 75.253(a)(5) (2024) and/or 34 C.F.R. § 75.253(f)(1) (2024).  Regulations governing the process for grant terminations prohibit Defendants from engaging in arbitrary and capricious terminations.  *See* 2 C.F.R.§ 200.341(a) (requiring written notice of any termination, which must "include the reason for termination"); 85 Fed. Reg. 49509 (grant terminations cannot be arbitrary).  Defendants' action is arbitrary and capricious because Defendants used the fiction of the DCL to undertake the undisclosed purpose of terminating a congressionally authorized and funded grant program.  In addition, Defendants' action is arbitrary and capricious because the Department did not provide a transparent and reasonable explanation for the termination of the

mental health grant. The Grant Termination Letter lists no specific reasons for the Department to use as the basis for terminating the grant.

Defendants' action is also arbitrary and capricious because Defendants failed to take into consideration the reliance interests of the School District, who has taken steps in the past and currently in reliance upon receiving the Federal grant award after meeting the requirements of Bipartisan Safer Communities Act and being awarded the grant.  Defendants' actions are arbitrary and capricious to the extent that the Department is relying on Department priorities that are contrary to the priorities the Department established in the first instance through required notice-and-comment rulemaking via publication in the Federal Register for the grant.  *See* 20 U.S.C. § 1232; 34 C.F.R. § 75.105.  To the extent the Department is relying on the explanation that the termination of the mental health grants effectuates a new Departmental priority to eliminate funding of DEI programs, the Defendants fail to define or identify what such programs would even involve and provides no explanation of how the grant is allegedly inconsistent with this priority.  Moreover, the Department is relying on the explanation that the termination effectuates a new Departmental priority to eliminate funding of DEI and equity-related programs, which is arbitrary and capricious and an abuse of discretion.

To the extent the Department is relying on a new interpretation of existing anti-discrimination laws in order to conclude that grant recipients' use of the mental health grants are a form of "DEI", that is discriminatory and unlawful and the Defendants' actions are arbitrary and capricious.  The Grant Termination Letter fails to provide "good reasons for"—any official change in agency policy "priorities."  *Fox Television Stations*, 556 U.S. at 515.  Equally, to the extent the Department is relying on the explanation that the terminated grant conflicts with the Department's policy of prioritizing "merit, fairness, and excellence in education," the

Department has never published a regulation describing or defining this policy priority as required by 20 U.S.C. § 1232(d), nor have Defendants explained how mental health grant is allegedly inconsistent with this priority.

The School District is harmed by the termination of the mental health grant. The School District is entitled to an order enjoining the Defendants' final agency actions pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, declaratory relief under 28 U.S.C. § 2201 and 5 U.S.C. § 706 that Defendants' actions were arbitrary and capricious and/or an abuse of discretion in violation of the APA, and a permanent injunction preventing Defendants from implementing, maintaining, or reinstating the mental health grants. Moreover, the School District also establishes a substantial likelihood that it will eventually prevail on the merits.

## I.    ADMINISTRATIVE PROCEDURES ACT – VIOLATION OF 5 U.S.C. § 706(2)(A) ), AND A SUBSTANTIAL LIKELIHOOD TO EVENTUALLY PREVAIL ON THE MERITS - AGENCY ACTION NOT IN ACCORDANCE WITH LAW UNDER 2 C.F.R. § 200.340

The Department is included in the definition of "agency" under the APA, 5 U.S.C. § 551(1), and Defendants' April 29th Grant Termination Letter is a final agency action subject to the APA. The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954). "An agency has the duty to follow its own federal regulations," and "[f]ailure to follow applicable regulations can lead to reversal of an agency order." *Nelson v. Immig. and Naturalization Serv.*, 232 F.3d 258, 262 (1st Cir. 2000).

An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures, particularly if that error prejudices the interest of a person before the

agency. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–47 (6th Cir. 2004). Defendants' Grant Termination Letter is not in accordance with the applicable law because Defendants are not authorized by the federal statutes and regulations to terminate federal grant awards on the grounds asserted in the Termination Letter. Nor are Defendants authorized to bar congressionally mandated grant programs under the pretext of what is or is not in the subjective interest of the Federal Government as determined by unnamed officials. Defendants are required to comply with 2 C.F.R. § 200.340(a)(4), which only authorizes termination of a Federal grant "pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Here, Defendants underwent notice and comment rulemaking to establish priorities, pursuant to the GEPA, 20 U.S.C. § 1232(d) and Defendants' own regulation, 34 C.F.R. § 75.105(b).

The School District relied upon these published priorities in crafting their grant application and accepting their grant award. However, in furtherance of the DCL, the Grant Termination Letter sets forth new priorities without undergoing notice and comment rulemaking and purports to terminate previously-awarded mental health grants based these new priorities. Accordingly, to the extent they apply at all, the Department lacked the authority under 2 C.F.R. § 200.340(a)(4) (2024) and/or 2 C.F.R. § 200.340(a)(2) (2020) to carry out the grant termination and violated the GEPA and their own regulations by terminating the grant. As such, the School District, as a grant award recipient, is prejudiced by this final agency action.

The School District is entitled to an order barring the Department's final agency action pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, declaratory relief under 28 U.S.C. § 2201 and 5 U.S.C. § 706, in that Defendants acted contrary to law in

terminating the previously-awarded mental health grant in violation of the APA, as well as a permanent injunction preventing Defendants from implementing, maintaining, or reinstating the April action against the School District. More importantly, the School District also establishes that it is has a substantial likelihood that it will eventually prevail on the merits.

### J.    TRO AND PRELIMINARY INJUNCTION ELEMENTS 3 AND 4: BALANCE OF HARMS AND PUBLIC INTEREST FAVOR THE SCHOOL DISTRICT

The balancing of harm and public interest compels temporary and preliminary relief. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (noting the balance of equities and the public interest "merge when the [g]overnment is the opposing party") (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "The Tenth Circuit has held that when a law 'is likely unconstitutional,' the government's interests do 'not outweigh a plaintiff's interest in having [its] constitutional rights protected.'" *Kansas*, 739 F. Supp. 3d at 932, *quoting  Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). "Further it is always in the public interest to 'prevent the violation of a party's constitutional rights.'" *Id.* Here, as set forth above, the School District has established a likelihood of success on the merits and irreparable harm to its students, staff and community in losing the grant award. *See, supra*. The "extremely high likelihood of success on the merits" here shows that preliminary relief "would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). More importantly, "the public has an important interest in making sure government agencies follow the law[,]" and follow their own regulations and rules. *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also League of Women Voters*, 838 F.3d at 12 (same). "[T]here is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood*

*of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (quoting *League of Women Voters*, 838 F.3d at 12).

The School District has a substantial interest in the successful operation of its educational system. The provision of a free public education to all the school age children of the State is the most important function of the State of New Mexico, and it is exclusively the responsibility of the State by and through its political subdivisions of local school districts. *See Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) (("[E]ducation is perhaps the most important function of state and local governments[.]"); *Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("We have recognized the public schools as a most vital civic institution for the preservation of a democratic system of government."); *see also Martinez v. Bynum*, 461 U.S. 321, 329 (1983).[6] Here, the School District and the public suffer significant harm when the Executive Branch terminates vital and relied upon federal funding without any notice or opportunity to mitigate the loss.

The Defendants face no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015), *quoting Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Since the termination of the grant award to the School District is unlawful, Defendants have no cognizable interest in their action to terminate federal funding. Thus, the public interest and the equities clearly favor the School District, and a temporary restraining order and/or a preliminary injunction is necessary to protect a vital source of federal funding for essential local government functions.

### K.    REQUESTED RELIEF

**WHEREFORE**, Plaintiff prays that this Court:

---

[6] Local school boards predate Statehood as a governmental entity related to ensuring public education in the State. *See Board of Education of City of Socorro v. Robinson*, 7 N.M. 231 (N.M. Terr. 1893). As part of New Mexico's Federal Enabling Act and New Mexico's Constitution, the School District is mandated to provide a general and uniform public education for all New Mexico school-aged citizens, including to those on portions of tribal lands located within the State of New Mexico. *See* Act of June 20, 1910, 36 Statutes at Large 557, Chapter 310, § 2; N.M. Const. Art. XII, §§ 1 and 3; N.M. Const. Art. XXI, § 4; N.M. Stat. Ann. § 22-1-4(A) (2015).

A.    Find that the School District has substantial likelihood of prevailing on the merits that the termination of the mental health grants was unlawful;

B.    Find that the School District has substantial likelihood of prevailing on the merits that Defendants' Dear Colleague Letter ("DCL") violates the First and Fifth Amendments to the United States Constitution;

C.    Find that the School District has substantial likelihood of prevailing on the merits that the DCL and termination of the mental health grant are arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to a constitutional right, in excess of statutory jurisdiction, and without observance of the procedures required by law within the meaning of 5 U.S.C. § 706(2);

D.    Find that the School District has substantial likelihood of prevailing on the merits that the DCL violates the Spending Clause of the United States Constitution;

E.    Hold unlawful, vacate, and set aside the DCL, the "End DEI" portal, and the FAQ;

F.    Temporarily and preliminarily restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing and/or implementing the DCL;

G.    Enter a preliminary injunction and temporary restraining order (a) enjoining Defendants' enforcement of the termination of the mental health grants; (b) ordering such grant funding reinstated forthwith; (c) ordering Defendants to provide the Grant Recipients reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order; (d) enjoining Defendants' termination of any additional mental health grants if such termination would be inconsistent with the Court's order; and (e) removing the use of such conditions for future agency action; and

H.      Grant such other relief as this Court may deem just and proper.

Respectfully submitted,

HIMES, PETRARCA & FESTER, CHTD.

By:   */s/ Andrew M. Sanchez*
     ANDREW M. SANCHEZ
     5051 Journal Center Blvd. NE, Suite 320
     Albuquerque, New Mexico  87109
     (505) 259-2069
     asanchez@edlawyer.com

     **ATTORNEYS FOR THE BOARD OF EDUCATION
     FOR THE SILVER CONSOLIDATED SCHOOLS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was submitted for e-filing through CM/ECF and was sent via electronic mail and U.S. Mail on this 25th day of June 2025 to:

| | |
|---|---|
| Alex Haas, Co-Director | Diane Kelleher, Co-Director |
| Federal Programs Branch, Civil Division | Federal Programs Branch, Civil Division |
| U.S. Department of Justice | U.S. Department of Justice |
| 950 Pennsylvania Avenue NW | 950 Pennsylvania Avenue NW |
| Washington, DC 20530-0001 | Washington, DC 20530-0001 |
| alex.haas@usdoj.gov | diane.kelleher@usdoj.gov |
| | |
| Pamela Bondi, U.S. Attorney General | Ryan Ellison, U.S. Attorney |
| U.S. Department of Justice | for The District of New Mexico |
| 950 Pennsylvania Ave NW | Office for the U.S. Attorney |
| Washington, DC 20530-0001 | 201 3rd Street NW, Suite 900 |
| pamela.bondi@usdoj.gov | Albuquerque, New Mexico 87102 |
| | usanm.usattorney@usdoj.gov |

HIMES, PETRARCA & FESTER, CHTD.

By:   *Andrew M. Sanchez*
   Andrew M. Sanchez (NM Bar# 11904)