IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BOARD OF EDUCATION FOR THE
SILVER CONSOLIDATED SCHOOLS,

      Plaintiff,

v.                                  No. 2:25-cv-586 WJ/GBW

LINDA MCMAHON, in her
official capacity as Secretary
of Education; U.S. DEPARTMENT
OF EDUCATION; and DONALD J. TRUMP,
in his official capacity as President of the
United States of America,

      Defendants.

**STATES OF NEW MEXICO, DELAWARE, MAINE, MARYLAND, MICHIGAN, MINNESOTA, OREGON, VERMONT, AND WASHINGTON'S AMICUS BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRANING ORDER AND/OR FOR PRELIMINARY INJUNCTION**

**INTRODUCTION AND STATEMENT OF INTEREST**

Amici States have a strong interest in the outcome of this case, given that it concerns needed support for the mental health of their young people. In 2022, the U.S. Congress passed the Bipartisan Safer Communities Act (BSCA), S. 2938, 117th Cong. (2022). This legislation was passed in the wake of increasing school violence, including a number of horrific mass shootings, such as those in Parkland, FL and Uvalde, TX. Sadly, Amici States, including New Mexico, have not been immune from this type of school violence. For instance, in 2017, a gunman murdered two students in a high school in Aztec, New Mexico. Mia Rupani, *Authorities Identify Two Victims in Shooting at Aztec High School*, Durango Herald (Dec. 7, 2017, at 10:10 PM), https://web.archive.org/web/20171208161637/https:/durangoherald.com/articles/198756-authorities-identify-two-victims-in-shooting-at-aztec-high-school.

The BSCA contained a number of initiatives designed to help prevent these types of violent incidents. Among such initiatives were those intended to safeguard youth mental health, including appropriations to the Department of Education (the Department) to award two different types of grants to improve student mental health. The Mental Health Service Professional Demonstration Grant Program (MHSP) would expand the pipeline of mental health providers into low-income elementary and secondary schools through innovative partnerships between universities and high-need school districts. The School-Based Mental Health Services Grant Program (SBMH) would hire qualified mental health professionals directly into schools with an eye towards program sustainability and staff retention.

School districts across the country, including those in New Mexico, have availed themselves of the opportunities provided by the BSCA. As relevant to this case, Silver City Consolidated Schools was awarded a SBMH grant, as was the Central Region Educational Cooperative (CREC), a consortium of rural school districts in central New Mexico. The grants have been very successful at curbing student behavioral and mental health problems, including bullying. *See, e.g.*, Compl. [Doc. 1, filed June 20, 2025], ¶¶ 94-98; Declaration of Laura Gilge, ¶ 12, *Washington v. U.S. Dept. of Educ.*, No. 2:25-cv-01228 (W.D. Wash., Doc. No. 91, filed July 8, 2025) (Gilge Decl.).

However, on April 29, 2025, Defendants inexplicably announced that they were discontinuing MHSP and SBMH grants (the Grant Termination Letters). Notice of Non-Continuation of Grant Award, attached as Exh. B to Plaintiff's Complaint [Doc. No. 1, filed June 20, 2025]. Although Plaintiff can spend funds already received through the end of the current budget period (December 31, 2025), the Department will not grant any more continuation awards, and the school districts will not be able to complete their projects. Moreover, the Grant

Termination Letters were unclear and failed to describe any criteria that would support discontinuation. Rather, they merely claimed that "[t]he Department has undertaken a review of grants and determined that the grant specified above provides for funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." *Id.* The Grant Termination Letters went on to include vague references to "Federal civil rights law," without specifying any alleged violations. *Id.* Similar letters were sent to school districts all over the country.

Amici are states concerned about the effect that the Grant Termination Letters will have on the ability of the grantee schools to provide mental health care to their students and the detrimental effect that this will have on children and adolescents in the states. Thus, Amici States submit this Amicus Brief setting forth their arguments and collective interests impacted by the federal government's actions.

While Plaintiff in the above styled cause and the Motion at issue seek broad relief regarding a number of Department of Education actions, including a Dear Colleague Letter filed earlier this year, as well as the Grant Termination Letters, the focus of this Brief is limited to the Grant Termination Letters. These letters violated the Administrative Procedures Act as arbitrary and capricious and in violation of the Department's own regulations. For this reason, and as set forth in more detail below, Plaintiff has a high likelihood of success on the merits on these grounds. In addition, discontinuation of the grants will cause irreparable harm to not only Plaintiff, but to other school districts across the country. Finally, the injunctive relief requested by Plaintiff is in the public interest, and the balance of the equities favors the requested injunction.

## **ARGUMENT**

Plaintiff's Motion for Preliminary Injunction should be granted. A Motion for Preliminary Injunction is evaluated based on four factors: "A plaintiff seeking a preliminary injunction must

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As set forth below, all four of the *Winter* factors support the grant of preliminary injunction.

### A. PLAINTIFF HAS A HIGH LIKELIHOOD OF SUCCESS ON THE MERITS

Under the statute governing review of agency actions, "[t]he reviewing court *shall* . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Based on this standard, the decision to discontinue the grants was unlawful for several reasons, two of which we address here. First, the decision was arbitrary and capricious, as no real grounds for the termination were stated in the letter. Second, Defendants' decision was not made in accordance with the regulations governing continuation of grants. Accordingly, Plaintiff will likely be successful on the merits.

1. <u>The Grant Termination Letters were Arbitrary and Capricious</u>

The APA requires that a court "hold unlawful and set aside agency action" that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). "An agency action is arbitrary or capricious 'if it is not reasonable and reasonably explained.'" *Colorado v. U.S. Dep't of Health & Hum. Servs.*, No. 1:25-CV-00121-MSM-LDA, 2025 WL 1426226, at *16 (D.R.I. May 16, 2025) (citing *Ohio v. EPA*, 603 U.S. 279, 292 (2024)). When assessing whether a final agency action is arbitrary or capricious, courts consider "only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

4

Especially relevant to the instant case is the principle that notices providing the same boilerplate explanations untethered to specific grants and the performance of specific grantees are the epitome of an arbitrary and capricious action because they show an obvious lack of individualized assessment. *See, e.g.*, *Colorado.*, 2025 WL 1426226, at *1 (boilerplate notices terminating grants failed to demonstrate individualized assessments of grantees' compliance with the agreements); *S. Educ. Found. v. U.S. Dep't of Educ.*, CV 25-1079 (PLF), ___ F. Supp. 3d.___, 2025 WL 1453047, at *16 (D.D.C. May 21, 2025) (agency must consider relevant data and include "a rational connection between the facts found and the choice made" (internal quotation marks and citation omitted)); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 857 (D. Md. 2025) ("[T]he Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthen[ed] Plaintiffs' argument that the Department did not consider individual, or any, data or information."); *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 770 F. Supp. 3d 121, 138-40 (D.D.C. 2025) (concluding that plaintiffs were likely to succeed on their arbitrary and capricious claims because they related to a blanket suspension of aid). Furthermore, when an agency has "relied on factors which Congress has not intended it to consider," its action fails arbitrary-and-capricious review. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Here, Defendants' Grant Termination Letters are arbitrary and capricious for at least three independently sufficient reasons.

*First*, the Grant Termination Letters are not reasonable or reasonably explained. In making this determination, the Court looks to the "grounds that the [Department] invoked" when it discontinued the grant. *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *see also Motor Vehicle Mfrs.*, 463 U.S. at 50 ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (citations omitted). Defendants have an obligation to "examine[] 'the relevant data'

and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com.*, 588 U.S. at 773 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Defendants plainly did not make the individualized assessment required for agency actions; instead, they issued blanket discontinuances using the same boilerplate language for each termination. As a result, the Grant Termination Letters provide no factual findings, much less a rational connection between any facts and Defendants' conclusion that the grant fails to meet the government's interest. Instead, the Grant Termination Letters make vague references to the "priorities" of the prior and current Administrations and list four theoretical bases for the grant discontinuance without identifying which, if any, of these bases apply specifically to each grantee. In short, Defendants provided no reasoned explanation for the grant discontinuance. Where a grantor cannot or does not identify the basis for its discontinuance, the decision is arbitrary and capricious. *See Am. Ass'n of Colls. for Tchr Educ.,* 770 F. Supp. 3d at 856-57.

*Second*, as noted above, an agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs.*, 463 U.S. at 43. The boilerplate letters received by the school districts were not based on the Congressional intent behind the grant appropriations. Rather, they vaguely alluded to changing priorities of the Executive Branch, which are entirely separate from legislative intent. To the extent Defendants discontinued the SBMH grants based on these changing priorities, the Grant Termination Letters were arbitrary and capricious. *Id.*

*Third*, Defendants' Grant Termination Letters also failed to account for the substantial reliance interests of those entities that were granted funds under the SBMH grants, including Plaintiff. "When an agency changes course, . . . it must be cognizant that longstanding policies

may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted). School districts within Amici States have structured their budgets with the understanding that Defendants would make annual continuation awards based on the districts' project performance under the Programs through the remainder of the project performance period. For instance, the Central Regional Educational Consortium created a Central New Mexico Schools Mental Health Partnership Project, relying in large part on the award of a SBMH grant. Gilge Decl., ¶ 9. Over the five-year life of the grant, "this initiative will provide more than 5,000 underserved children with access to life-saving mental heath supports and innovative technology-based tools that will transform the climate of their families and educational spaces." *Id.* The project includes the hiring of mental health professionals to increase the ratio of professionals to students. *Id.*

Amici States and their school districts' reliance is based on, among other things, Defendants' history and practice under the Programs, and Defendants' regulations showing Defendants' "intention to make continuation awards to fund the remainder of the project period" upon approval of the school districts' multi-year grants, 34 C.F.R. § 75.251(b)(2), and prioritization of "continuation awards over new grants," 34 C.F.R. § 75.253(c). Indeed, Laura Gilge, project manager for CREC, stated that, in her experience, "discontinuance of a project's funding is rare," and noted that she had never before "had a project's funding discontinued or terminated." Gilge Decl., ¶ 13. To her knowledge, "discontinuance or termination has only occurred in cases of misconduct." *Id.* The regulations pertaining to the continuation of a grant are based on the performance of the grantee, something that is within the grantee's control. 34 C.F.R.

§ 75.253(b). Believing that they had control over the future of the grant, the school districts invested time and resources that will be lost with these discontinuances.

Defendants did not consider any of these reliance interests, much less weigh them against competing policy concerns (if any), or consider any alternatives. In sum, Defendants failed to engage in any "reasoned decision making" whatsoever, *see Michigan v. EPA*, 576 U.S. at 750, and Defendants' Grant Termination Letters were therefore arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

2. The Grant Termination Letters were Contrary to Law

The Grant Termination Letters should also be set aside because they are contrary to the applicable law. 5 U.S.C. § 706(2)(A). In this case, the applicable law is the Department's body of financial assistance regulations. By issuing these letters, Secretary McMahon violated these regulations, which are intended to ensure a fair and transparent process in the Department's selection and administration of state financial assistance. Defendants misinterpreted the Department's grant continuation regulation, 34 C.F.R. §75.253, and claimed that they may change the rules of the game midstream, torpedoing multi-year, multi-million-dollar projects that were selected through a competitive peer reviewed process that evaluated project quality and design. In short, Defendants violated the Department's grant regulations by (1) considering information (*i.e.*, an alleged conflict with new priorities) that the regulations do not allow Defendants to consider when deciding whether to continue various multi-year grants, including Plaintiff's, 34 C.F.R. § 75.253(b), and (2) failing to prioritize continuation awards over new grants, as required by 34 C.F.R. § 75.253(c).

In the Grant Termination Letters, including Plaintiff's, Defendants contended that the issuance of the grants had been based on the priorities of the previous Administration, but that they were no longer aligned with those of the current Administration. Defendants' colloquial use of the word "priorities" in its Grant Termination Letters misapprehends that it is a term of art in financial assistance programs. The Department may develop and utilize priorities in selecting applicants for a "*new grant.*" When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice that explains, among other things:

1. Whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved;

2. The priorities established for the selection of new grants for the program that year, including any competitive preference priorities for which an application could receive bonus points;

3. The selection criteria and factors used to decide which applications will be awarded new grants and how the criteria will be weighted; and

4. Any program performance measure requirements, including whether the application should propose project-specific performance measures and explain how the proposed measures would accurately measure project performance.

*See* 34 C.F.R. §§ 75.100, 75.101, 75.105, 75.110, 75.201.

However, Defendants can only set Program priorities at the outset, when Defendants publish the application notice for that year's grant applications. *See, e.g.*, 34 C.F.R. § 75.105(a) ("[T]he Secretary establishes priorities for selection of applications *in a particular fiscal year*." (emphasis added)); *id.* § 75.101(a)(4) (application notice includes "[a]ny priorities established by the Secretary for *the program for that year*" (emphasis added)). There is no legal basis cited by

Defendants upon which they may retroactively change the priorities for a particular year's grant Program after the competition is over and the grants have been awarded, and Amici States are aware of none.

Moreover, the regulations concerning continuation grants do not allow for Defendants to set new priorities mid-project. Continuation grants are an inherent part of any multi-year project award. Although "[t]he Secretary may approve a project period of up to 60 months," 34 C.F.R. § 75.250, the Secretary generally obligates funding for multi-year projects in 12-month budget period increments. 34 C.F.R. § 75.251(a). If the Secretary approves a multi-year project, the Secretary "(1) [m]akes a grant to the project for the initial budget period; and (2) [i]ndicates his or her intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b).

The Department uses continuation awards to fund the subsequent budget periods of an approved multi-year grant. *See id.*; 34 C.F.R. § 75.253. Unlike a new grant award, a continuation award does not go through the program competition process, is not scored using priorities or selection criteria, and is not ranked against other grants. *See, e.g.*, 58 Fed. Reg. 40,630 (July 29, 1993) ("The Department uses non-competing continuation grant awards to continue funding after the first year of a project for the remaining years of a multi-year project that was initially selected on a competitive basis."). Instead, the continuation award decision is based on the grantee's performance under the approved multi-year project. It is thus fairly assumed that, barring any failure on the part of the grantee to comply with the grant terms, the continuation grant will be awarded.

Amici States' position on this issue is supported by other regulatory history. Throughout the history of the Department's grant regulations, the Department has repeatedly emphasized that

continuation funding is based on the grantee's performance under the priorities and performance measures under which the Department awarded the grant. *See* 57 Fed. Reg. 30,328 (July 8, 1992) (updating regulations "to require grantees to make substantial progress in meeting the objectives of the project in order to receive a continuation award").

Further, in enacting the regulations in question, the Department did not contemplate a mass discontinuation of grants based on an alleged conflict with a new administration's program priorities. The Department has explained: "In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award." 89 Fed. Reg. 70,300, 70,316 (Aug. 29, 2024). In its most recent update to the regulations, the Department assumed it might receive, at most, ten requests for reconsideration of a discontinuation decision per year, which it "believe[d] is an overestimate of the likely incidence." *Id*. That is a far cry from the mass discontinuances the Department issued here.

Indeed, the regulations provide only two situations in which "[t]he Secretary may decide not to make a continuation award":

> (1) A grantee fails to meet any of the requirements in [34 C.F.R. § 75.253(a)]; or
>
> (2) A grantee fails to ensure that data submitted to the Department as a condition of the grant meet the definition of "quality data" in 34 CFR 77.1(c) and does not have a plan acceptable to the Secretary for addressing data-quality issues in the next budget period.

34 C.F.R. § 75.253(f).

Relatedly, Section 75.253(a) provides five requirements that a grantee must satisfy to receive a continuation award, which are consistent with the focus on grantee performance for continuation decisions. *See* 34 C.F.R. § 75.253(a)(1)-(5) (noting that, to secure a continuation

11

award, the grantee must (1) "[d]emonstrate that it has made substantial progress in achieving (A) [t]he goals and objectives of the project; and (B) [t]he performance targets in the grantee's approved application," or, alternately, obtain the Secretary's approval for project changes; (2) submit all required reports; (3) continue to meet program eligibility requirements; (4) maintain required financial and administrative management systems; and (5) receive a determination that continuation of the project is in the best interest of the Federal Government).

In addition, the regulations circumscribe the information that may be considered when determining if the § 75.253(a) requirements are met, limiting it to relevant information about *the grantee's performance*, by stating,

> In determining whether the grantee has met the requirements described in paragraph (a) of this section, the Secretary may consider any relevant information *regarding grantee performance*. This includes considering [performance] reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information.

34 C.F.R. § 75.253(c) (emphasis added); *see, e.g.*, *Navajo Nation v. Dalley*, 896 F.3d 1196, 1213 (10th Cir. 2018) ("[T]he canon *expressio unius est exclusion alterius* . . . provides that the expression of one item of an associated group or series excludes another left unmentioned." (citation modified)). In addition, statutes and regulations are governed by the doctrine of "*ejusdem generis*, the familiar canon of statutory interpretation that courts interpret a general or collective term at the end of a list of specific items in light of any common attributes shared by the specific items." *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024) (citation modified). In dealing with continuation grants, the general or collective term is "relevant information," which should be interpreted to encompass information regarding the performance of the grantee, rather than any other information, such as a change in administrative policy.

Here, Defendants violated Section 75.253 because they considered information that was not relevant to grantee performance. Defendants' boilerplate termination letters make no reference whatsoever to the various school districts' progress reports, performance measures, financial information, or any other relevant information regarding their performance under their multi-year grants, let alone any indication that Defendants considered the school districts' performance when determining whether they met the § 75.253(a) requirements.

Instead, Defendants discontinued the grants because the grants purportedly "provide[] funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." Grant Termination Letter. Such action violates the regulatory requirement to consider grantee performance in continuation decisions. Logically, grantee performance must be evaluated against the priorities and other criteria established at the time of the initial award. The grantee designed its multi-year project proposal based on the Program priorities for new grant applications that year, the Secretary selected the grantee's application after evaluating all applications using that year's priorities, and the grantee executed the grant based on its approved multi-year proposal.

Moreover, Defendants' terminations are also contrary to law because the Secretary failed to give priority to continuation awards over new grants. *See* 34 C.F.R. § 75.253(c) ("Subject to the criteria in paragraphs (a) and (b) of this section, in selecting applications for funding under a program, the Secretary gives priority to continuation awards over new grants."). Defendants have informed Congress that they intend to rebid and reissue the SBMH and MHSP funds that were discontinued. *See, e.g.*, Annie Ma, *Rural Schools Feel the Pinch from Trump Administration's Cuts to Mental Health Grants*, Associated Press (June 26, 2025). Such action forces school districts like Plaintiff, who have already received grants and approval for continuing grants under the

program, to submit new applications and compete in a new grant competition. This violates the regulatory requirement that continuation grants have priority over new grants.

Finally, even assuming, *arguendo*, that Defendants could discontinue multi-year grants like the one granted to Plaintiff based on changed priorities, the Grant Termination Letters were still improper. Defendants are required to follow the APA's notice-and-comment rulemaking procedure when changing priorities for financial assistance. *See* 20 U.S.C. § 1232(a)(2)&(d) (stating that the exemption from APA's notice and comment requirements are only applicable to "regulations that govern the first grant competition under a new or substantially revised program authority," which would certainly not be applicable to continuation grants issued under unchanged program authority); *see also* 20 U.S.C. § 1221e-4 (stating that notwithstanding any other provision of law, the Department must publish regulations affecting any institution of higher education, along with an education impact assessment statement, in the Federal Register before such regulations may become effective). Indeed, consistent with its statutory obligations, the Department undertook the notice-and-comment rulemaking process when set SBMH and MHSP program priorities in 2022. *See* 87 Fed. Reg. 47,152 (Aug. 2, 2022) (SBMH proposed priorities); 87 Fed. Reg. 60,092 (Oct. 4, 2022) (SBMH final priorities); 87 Fed. Reg. 47,159 (Aug. 2, 2022) (MHSP proposed priorities); 87 Fed. Reg. 60,083 (Oct. 4, 2022) (MHSP final priorities). In contrast, the priorities referenced in the Grant Termination Letters were not published before the Department applied its new priorities to discontinue the grants. As the Grant Termination Letters referenced unpublished priorities contrary to procedures required by law, they must be set aside.

### B. SCHOOL DISTRICTS IN AMICI STATES, INCLUDING PLAINTIFF, WILL SUFFER IRREPARABLE HARM WITHOUT PRELIMINARY RELIEF

The second *Winter* factor, the risk of irreparable harm, also favors preliminary relief. Irreparable harm occurs when "the court would be unable to grant an effective monetary remedy

14

after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). Defendants' Grant Termination Letters have caused Amici States' school districts, including Plaintiff, irreparable harm because Defendants' plan to recompete these limited funds will deprive them of the opportunity for relief. In addition, Defendants' actions harm public health and safety and shutter mental health programs, harming organizational missions in the process.

Should this Court not grant preliminary relief, and the Department proceeds with recompeting and obligating funds to other grantees, monetary relief will not be available. *Cf. Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982). ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (noting that "if the government in the instant case is permitted to *distribute* the $10 million to other organizations, the appeal will become moot").

As these Programs addressed an epidemic in school violence and mental health illness in our youth, this Court may easily find that the Grant Termination Letters harm public health and safety. *See Douglas Cnty. Sch. Dist. RE-1 v. Douglas Cnty. Health Dep't*, 568 F. Supp. 3d 1158, 1166 (D. Colo. 2021) (considering the irreparable harm to students' health and safety posed by health order easing COVID-19 protocols); *Sierra Club v. U.S. Dep't of Agric., Rural Utils. Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (threats to public health establish irreparable harm). So too does it threaten the education missions of Plaintiffs. *See Douglas*, 568 F. Supp. 3d at 1166 (considering students' interest in being provided "with equal access to a public education"). As described above and set forth in greater detail below, there can be no doubt that the Grant

15

Termination Letters are causing serious and irreparable harm to mental health and educational programs initiated by school districts across the country, including Plaintiff, as well as causing serious harm to the health and safety of the children served by these districts.

As noted above, CREC utilized its SBMH grant to create Central New Mexico Schools Mental Health Partnership Project, which provided access to mental health care to thousands of students who otherwise would not receive it. This partnership has allowed mental health professionals to travel to rural districts on a daily basis to provide services to students and staff. Gilge Decl. ¶ 12. Further, "[i]n at least two districts, providers were on hand in the last two school years to provide mental health support to the school and community members through tragedies that occurred there." In addition, the superintendents of the CREC districts "report that since the inception of the program they have seen a significant reduction in classroom behavior[al problems], a reduction in detention issues, a significant improvement in students' mental health, an increase in parent engagement, an improvement in attendance and an increase in academic success."

Threats to an organization's mission and the very existence of programs constitute irreparable harm. *See Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1013 (10th Cir. 2018) (analyzing irreparable harm to a business). The simple fact is that these school districts do not have the resources to make up for the loss in funding. "Over 5,000 students in seven rural school districts of central New Mexico will lose access to direct, in-school behavioral health and behavioral support services in January if funding is not reinstated." Gilge Decl., ¶ 18. This anticipated loss in mental health providers is especially ominous when "[t]he State of New Mexico is already experiencing a significant mental health crisis having one of the highest rates of suicide in the nation and a huge shortage of behavioral health providers," especially in rural areas. *Id.* Critically,

the loss of funding will likely result in staff cuts. These cuts will include highly trained and specialized employees who developed key relationships with students and who will be difficult to hire back, this loss of staff itself is irreparable harm. *See Dominion*, 356 F.3d at 1263 (listing factors supporting irreparable harm and including "loss of employees' unique services"); *see also DigitalGlobe, Inc. v. Paladino*, 269 F. Supp. 3d 1112, 1131 (D. Colo. 2017) (finding the fact that employer had lost the services of multiple employees weighed in favor of a preliminary injunction). Indeed, "[o]ne [CREC] provider has already resigned due to the program's funding uncertainty." Gilge Decl., ¶ 12. Simply put, Defendants' Grant Termination Letters are causing substantial immediate irreparable harm.

### C. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST SUPPORT THE GRANT OF PRELIMINARY RELIEF

The final two *Winter* factors—the balance of the equities and the public interest—merge when the government is a party. *Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1095 (D.N.M. 2024) (citing *Niken v. Holder*, 556 U.S. 418, 435 (2009). Here, both factors tip sharply in Plaintiff's favor. The threat of harm to schoolchildren and schools in Amicus States, including Plaintiff, far outweighs the Federal Government's interests in ending programmatic mental health care funding in schools. *See Jaffee v. Redmond*, 518 U.S. 1, 11 (1996) ("The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance."). The balance of equities supports a preliminary injunction, and the Court should preserve the status quo until the case can be decided on the merits.

Whatever interest the Federal Government may have in cutting off mental health care services to students attending some of our States' most rural and low-income schools during the pendency of this case is negligible compared to the school districts' irreparable harm. In contrast to those irreparable harm, a preliminary injunction would not harm the Federal Government at all

but merely maintain the status quo by requiring the Department to administer appropriated funds as directed by Congress until the Court can properly review the merits of this case. The programs have successfully served students for the past several years. Indeed, when Congress appropriated the funds for the SBMH and MHSG grants in the BSCA, it did so in equal amounts for fiscal years 2022 through 2026. 136 Stat. 1342. Thus, Congress has already funded the Programs for fiscal year 2026. Defendants' interest in discontinuing funding for vital mental health school-based programs in some states but not others does not outweigh the public's interest in providing students the mental health services they need. The balance of harms and the public interest weigh decidedly in Plaintiff's favor.

## **CONCLUSION**

Based on the foregoing, Amici States respectfully request that this Honorable Court issue a temporary restraining order and/or a preliminary injunction staying the Grant Termination Letters.

Respectfully submitted,

| | |
|---|---|
| RAÚL TORREZ<br>*New Mexico Attorney General*<br><br>By:   /s/ *Lawrence M. Marcus*<br>Aletheia V.P. Allen<br>*Solicitor General*<br>Lawrence M. Marcus<br>*Assistant Solicitor General*<br>Henry Chynoweth<br>*Assistant Solicitor General*<br><br>New Mexico Department of Justice<br>201 3rd St. NW, Ste. 300<br>Albuquerque, NM 87102<br>lmarcus@nmdoj.gov | KATHLEEN JENNINGS<br>*Attorney General of the State of Delaware*<br>Delaware Department of Justice<br>820 N. French Street<br>Wilmington, DE 19801<br><br><br>AARON M. FREY<br>*Attorney General of Maine*<br>6 State House Station<br>Augusta, ME 04333-0006<br><br><br>ANTHONY G. BROWN<br>*Attorney General State of Maryland*<br>200 Saint Paul Place<br>Baltimore, MD 21202 |

| | |
|---|---|
| DANA NESSEL<br>*Michigan Attorney General*<br>P.O. Box 30212<br>Lansing, Michigan 48909 | CHARITY R. CLARK<br>*Vermont Attorney General*<br>109 State Street<br>Montpelier, VT 05609 |
| KEITH ELLISON<br>*Minnesota Attorney General*<br>Office of the Minnesota Attorney General<br>445 Minnesota Street, Suite 600<br>Saint Paul, MN 55101 | NICHOLAS W. BROWN<br>*Attorney General*<br>*State of Washington*<br>P.O. Box 40100<br>Olympia, WA 98504 |

DAN RAYFIELD
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

## CERTIFICATE OF SERVICE

On July 9, 2025, I filed the foregoing document through the Court's CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

　　　　/s/   Lawrence M. Marcus　　　

Lawrence M. Marcus