# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

**BOARD OF EDUCATION FOR THE
SILVER CONSOLIDATED SCHOOLS**,

        Plaintiff,

        vs.                                  Case No. 25-cv-586-WJ-GBW

**LINDA MCMAHON**, in her official capacity
as Secretary of Education; **U.S. DEPARTMENT
OF EDUCATION**; and **DONALD J. TRUMP**, in
his official capacity as President of the United
States of America,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNTION[1]

      **THIS MATTER** comes before the Court on Plaintiff's "Motion for Temporary Restraining Order and/or Preliminary Injunction" (**Doc. 6**), Defendants' Response in Opposition (**Doc. 21**), and Plaintiff's Reply (**Doc. 24**). Having considered the written and oral arguments of counsel, as well as the applicable law, the Court finds that Plaintiff has not met its burden for obtaining injunctive relief. Moreover, because Plaintiff—in essence—seeks to have the United States pay out a contract, the lawsuit must be brought in the U.S. Court of Federal Claims. Accordingly, this Court lacks jurisdiction to grant the relief sought by Plaintiff so the Motion for a preliminary injunction is **DENIED** and the case is **DISMISSED without prejudice** for the reasons explained in this Memorandum Opinion and Order.

---

[1] "[W]hen a temporary restraining order is sought on notice to the adverse party, it may be treated by the court as a motion for a preliminary injunction." 13 MOORE'S FEDERAL PRACTICE § 65.31 (2020); _see_ Fed. R. Civ. P. 65(a)(1). Defendants received notice of Plaintiff's motion and filed a response opposing it (**Docs. 13, 18, 18-1, & 21**). The Court, therefore, treats Plaintiff's request for a temporary restraining order as a request solely for a preliminary injunction.

**BACKGROUND**

Under Article I of the U.S. Constitution, Congress has the power of the purse—and appropriates funds to be spent. The President, under Article II, decides how to spend those funds in faithful execution of the law.

Since taking office, President Trump has issued numerous Executive Orders looking to eliminate fraud, waste, and abuse in federal spending. One such area of spending the Administration has endeavored to rein in is diversity, equity, and inclusion ("DEI") programs. Shortly after taking office, the Trump Administration issued:

- Exec. Order No. 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." *See* 90 Fed. Reg. 8339 (Jan. 29, 2025);

- Exec. Order No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." *See* 90 Fed. Reg. 8633 (Jan. 31, 2025); and

- Exec. Order No. 14190, titled "Ending Radical Indoctrination in K-12 Schooling." *See* 90 Fed. Reg. 8853 (Feb. 3, 2025).

The U.S. Department of Education also issued a "Dear Colleague Letter" ("DCL"), which explains that a "potential loss of federal funding" may result if schools engage in discrimination—including that which falls "under the banner of "'diversity, equity, and inclusion' ('DEI')." **Doc. 1-1 at 2 & 4**. Importantly, the DCL states its funding decisions will be "consistent with applicable law." ***Id.* at 4**. Following the issuance of these Executive Orders, various agency officials have taken actions to institute suspensions, revocations, or non-continuations of appropriated funds because they either: (1) are not in the "best interest" of the Government, or (2) "no longer effectuate[] the program goals or agency priorities." 34 C.F.R. § 75.253 & 2 C.F.R. § 200.340.

\* \* \*

Plaintiff challenges the legality of Defendants' discontinuation of Plaintiff's mental health grant funding made available under the Bipartisan Safer Communities Act. Specifically at issue here is a $6 million grant for mental health services (which was part of a larger $1 billion spending package). *See* Bipartisan Safer Communities Act, Pub. L. No. 117–159, 136 Stat. 1313 (2022). The Act expanded access to school-based behavioral health services for children and families. *See* Pub. L. No. 117–159, §§ 11001–11005, 136 Stat. 1313, 1314–22. This money for pediatric health care access was to remain available through 2027. 136 Stat. 1313, 1322.

As stated above, Plaintiff applied for—and received—grant funding in 2023. **Doc. 21 at 9** (citing **Doc. 21-1 at 7**). The funding—and the Grant Award Notification ("GAN")—contained various terms and conditions. One condition is that recipients must comply with all "applicable to Federal civil rights laws." **Doc. 21 at 8** (citing 87 Fed. Reg. 60137, 60143 (Oct. 4, 2022)); *see also* **Doc. 21-1 at 156–57**. Another condition is that funding for future years would depend upon the Secretary of Education's decision to make a "continuation award." **Doc. 21 at 8** (citing 87 Fed. Reg. at 60137, 60144); *see also* **Doc. 21-1 at 7–8** (explaining "CONTINUED FUNDING" requires a determination that "THE PROJECT WOULD BE IN THE BEST INTEREST OF THE GOVERNMENT."). The GAN also says the grant was awarded for a one-year "budget period" and subject to "continued funding." *Id.* **at 7–10**. In so doing, the "GAN" cites to 34 C.F.R. § 75.253. *Id.* **at 8**. And it even says the Secretary is not bound to "funding the award" for the time or amounts shown. *Id.* **at 8**.

Plaintiff's grant was continued in 2024 and 2025. **Doc. 21-1 at 58 & 104**. However, on April 29, 2025, Plaintiff received a "Notice of Non-Continuation of Grant Award." **Doc. 1-2**. This Notice did not cancel funds "owed for work already completed." *AIDS Vaccine Advoc. Coal.*, 145

S. Ct. 753, 753 (2025). Rather, the Notice explained the grant will "not [be] continue[d] . . . at the end of [the] current grant budget period." *Id.* at 1; *see also* **Doc. 9 at 25**; **Doc. 21 at 10**.

Plaintiff did not seek "reconsideration" of this non-continuation decision under 34 C.F.R. § 75.253(g). *See* **Doc. 21 at 10** (citing **Doc. 21-1 at 3 ¶ 5**).

## THE FILINGS

### I. Plaintiff's Complaint, Motion, and Brief in Support

The Board of Education for the Silver Consolidated Schools ("Plaintiff") brings this lawsuit against Linda McMahon, Secretary of Education; the Department of Education; and Donald J. Trump, President of the United States (collectively "Defendants") alleging that the "termination" of mental health grant funding from the Bipartisan Safer Communities Act violates the law (**Doc. 1 at 1–3**; **Doc. 9 at 3–4**).

Plaintiff seeks a declaratory judgment and injunctive relief. **Doc. 1 at 25–26 & 38–39**. As grounds, Plaintiff argues the Department of Education's DCL[2] as well as Defendants' subsequent termination of the mental health grants violates: (1) the First Amendment, (2) the Fifth Amendment, and (3) the Spending Clause of the United States Constitution. *Id.* at 26–32. Plaintiff also contends the Defendants acts are "ultra vires" and violative of the Administrative Procedure Act ("APA"). *Id.* at 32–37. In sum, Plaintiff requests the Court: (1) declare the termination of the grants is unlawful, (2) declare the DCL is arbitrary and capricious under the APA, (3) hold unlawful, vacate, and set aside the DCL, and (4) preliminarily and permanently enjoin the

---

[2] Plaintiff's Complaint, *see* **Doc. 1 at ¶ 18**, frames the DCL as "threatening . . . the loss of federal funding." According to Plaintiff, this DCL "does not operate as any other Dear Colleague Letter." **Doc. 1 at ¶ 21 & n.1**. But that's not quite right. This DCL tracks with other (perhaps more well-known) DCLs. For example, back in 2011 the Department of Education issued a letter stating that "withdraw[al of] Federal funding" may result if a "recipient does not . . . compl[y]" with Title IX. That DCL was the focus of much litigation. *See, e.g., Doe v. Univ. of Denver*, 952 F.3d 1182, 1188 (10th Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019); *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1107 n.3 (9th Cir. 2020).

enforcement and/or implementation of the DCL. *Id.* **at 38–39 ¶¶ A–J**. In other words, Plaintiff wants the Court to: (1) reinstate the mental health funding moving forward, (2) provide reimbursement for expenditures in the interim, and (3) prohibit Defendants from terminating additional future mental health grants. *Id.* **at ¶ G**.

## II. Defendants' Response in Opposition

Defendants responded (**Doc. 21**) arguing that a preliminary injunction is not warranted. From their perspective, Plaintiff fails the four-factor test outlined in *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (citation omitted). *Id.* **at 14–15**. In particular, Defendants argue that because the discontinuation of funding "does not take effect until the beginning of the 2026 calendar year," there is no "irreparable harm." *Id.* **at 4**.

Defendants' strongest argument is that this Court lacks jurisdiction. *Id.* **at 20–31**. According to Defendants, Plaintiff attempts to convert a contractual dispute to pay money into APA and constitutional claims. *Id.* **at 23–27**. And because the "essence" of Plaintiff's claims is about a contract, then the Tucker Act[3] provides that only the Court of Federal Claims has jurisdiction. *Id.* **at 22–23**.

---

[3] On "March 3, 1887," Congress passed a law "provid[ing] for the bringing of suits against the government of the United States" commonly known as "the Tucker Act." *Chase v. United States*, 155 U.S. 489, 495 (1894). The current version of the Tucker Act closely resembles the 1887 Act. *Compare* 28 U.S.C. § 1491, *with* § 1, 24 Stat. 505. Essentially, the Tucker Act—as amended—authorizes suits against the Government for contract and property claims to be brought in the Court of Claims. *United States v. Hopkins*, 427 U.S. 123, 124–26 (1976) (per curiam). And Congress "intended the Court of Federal Claims to have exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000 that is founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1332–33 (Fed. Cir. 2004).

Sixth Circuit Judge Jeffrey Sutton provides a more in-depth history of the "Big and Little Tucker Acts" in *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 815 (6th Cir. 2015).

### III. Plaintiff's Reply

The Reply raises three primary arguments with respect to jurisdiction. First, Plaintiff cites to numerous district court cases concluding jurisdiction was proper (**Doc. 24 at 3–7**). Second, Plaintiff cites to two Tenth Circuit cases (purportedly)[4] in support of bringing statutory or constitutional claims in federal district court. *Id.* **at 4 & 9**. And third, Plaintiff says it is "not seeking damages owed in contract." *Id.* **at 9**.

### THE HEARING

The parties thoroughly briefed the motion for a preliminary injunction (**Docs. 1, 6, 9, 21**).[5] And on July 16, 2025, the Court held a hearing (**Docs. 10, 13, 15**). Counsel for Plaintiff and Defendants appeared for the hearing. *See* **Doc. 26** (Clerk's Minutes).

Plaintiff requests a preliminary injunction to stop Defendants from enforcing the DCL and "Notice of Non-Continuation." At the hearing, Plaintiff—through counsel—argued that the Defendants acted without statutory authority and in violation of the Constitution. As a result of the grant "termination," Plaintiff says it has suffered irreparable harm. In support of this "irreparable harm" factor, Plaintiff presented witness testimony.[6] For the jurisdictional question, Plaintiff

---

[4] Plaintiff cites to *Normandy Apts., Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009) and *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083–84 (10th Cir. 2006).
    But the *Normandy* Court was applying the so-called "Little Tucker Act" under 28 U.S.C. § 1346. *See Union Pac. R.R. Co. v. U.S. ex rel. U.S. Army Corps of Eng'rs*, 591 F.3d 1311, 1314 (10th Cir. 2010). *see also supra* n.3.
    In *Robbins*, the Tenth Circuit adopted the reasoning of *Transohio Sav. Bank v. Dirs., Office of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992)—but that case was overruled by *Perry Capital LLC ex rel. Inv. Funds v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Moreover, all that *Robbins* truly stands for is the notion that a court must look to the "essence" of a particular action to determine if it's based in contract. *See Rural Water Sewer & Solid Waste Mgmt. v. City of Guthrie*, 654 F.3d 1058, 1071 (10th Cir. 2011); *see also infra* ¶ I.
[5] An *amicus* brief—on behalf of several States—was filed as well. *See* **Docs. 14 & 17**.
[6] Plaintiff did not provide notice that any witnesses would be called to testify. Naturally, Defendants objected. Nevertheless, the Court allowed Plaintiff to call its witnesses and develop a record—and Defendants were offered an opportunity to file supplemental briefing (which they declined).
    As explained later, *see infra* ¶¶ II.A.–B., the witness testimony is unavailing as to the likelihood of success or irreparable harm factors. At the same time, though, the witness testimony was persuasive as to

argued: (1) this isn't a contract case that falls under the Tucker Act, (2) this case isn't about money, and (3) the Supreme Court's emergency docket is not precedential.

The United States (*i.e.*, Defendants) first argued that a preliminary injunction is not warranted because the non-continuation of Plaintiff's grant funding does not take effect until December 31, 2025. Counsel also argued that the fact Plaintiff waited two months to file for a temporary restraining order counsels against granting "extraordinary relief." Next, the Defendants argued this Court lacks jurisdiction to adjudicate the non-continuation of the grant funding—and cited to recent cases supporting their likely success on the merits. Defendants also argued that the non-continuation is a discretionary agency action not subject to judicial review. In their view, continuing—or discontinuing—grant funding in the "best interest" of the Government is a policy decision. At bottom, Defendants urged this Court to follow the dictates of the Supreme Court, rather than relying on the out-of-circuit district court cases cited by Plaintiff.

## LEGAL STANDARD

To obtain a preliminary injunction, the movant must establish (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) the "balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *M.G. v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A showing of "irreparable harm is the single most important prerequisite." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1268 (10th Cir. 2005) (citation omitted). But the "likelihood of success" factor is equally important. *Cf. GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

---

the public interest factor. *See infra* ¶ II.C. But because the Court concludes it lacks jurisdiction, that issue is essentially moot.

A preliminary injunction is an "extraordinary remedy"—meaning it is "the exception rather than the rule." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). Yet, some injunctions require even more. *Schrier*, 427 F.3d at 1258–59. So-called "disfavored" injunctions are those that "don't merely preserve the parties' relative positions pending trial." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). Disfavored injunctions are those that: (1) mandate action (rather than prohibiting it), (2) change the status quo, or (3) grant all the relief that the moving party could expect from a trial win.

Here, Plaintiff seeks a declaratory judgment—and asks the Court to "declare" that Defendants violated the Constitution. **Doc. 1 at 38–39**; **Doc. 9 at 42 ¶¶ A–D**. Plaintiff also asks the Court to hold "unlawful, vacate, and set aside" the DCL, FAQs, and DEI portal. **Doc. 9 at 42**. This is a run-of-the-mill APA request. But the fact Plaintiff asks this Court to: (1) "order[] . . . grant funding [be] reinstated forthwith," (2) "provide the Grant Recipients reimbursement," and (3) enjoin Defendants' termination of "any additional mental health grants" (**Doc. 9 at 42 ¶ G**)—the Court cannot help but conclude Plaintiff is requesting a disfavored injunction.

## SURVEY OF RECENT CASES

A few cases are particularly instructive here.

The first—and most authoritative—is *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). There, the Supreme Court found that the United States "is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968. In so doing, the Court noted that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money.'" *Id.* (citation omitted). The Court also

pointed out that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract.'" *Id.* (citation omitted).

Next, on July 8, 2025, the Supreme Court granted a stay of a preliminary injunction wherein the district court found an Executive Order and "joint memorandum from the [OMB] and [OPM] implementing that Executive Order" to be unlawful. *Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. __, 2025 U.S. LEXIS 2667, at *1 (2025) (mem.). The Supreme Court disagreed—and explained the United States is "likely to succeed on its argument that the Executive Order and Memorandum are lawful." *Id.* Justice Sotomayor highlighted the Executive Order's language stating agency actions must be "consistent with applicable law." *Id.* at *2 (Sotomayor, J., concurring in the grant of stay).

And just this week, the Supreme Court granted a stay in the Department of Education's reduction in force case. *See McMahon v. New York*, 606 U.S. __, 2025 U.S. LEXIS 2670, at *1 (2025) (mem.). Even though the stay order[7] itself might not have precedential value, the stay order "divests the district court's order." *Dep't of Homeland Sec. v. D.V.D.*, 606 U.S. __, 2025 U.S. LEXIS 2666, at *2 (2025) (mem.) (cleaned up). This Court is also cognizant of the fact that "the Government . . . suffer[s] irreparable harm" when district courts enter injunctions that exceed their authority. *Trump v. CASA, Inc.*, 606 U.S. __, 2025 U.S. LEXIS 2501, at *34 (2025).

* * *

Following these Supreme Court rulings, several courts of appeals have sided with the United States' argument that the Court of Federal Claims is "the only forum open" to Plaintiffs bringing contract claims. *Widakuswara v. Lake*, 2025 U.S. App. LEXIS 11036, at *7 & 16 (D.C.

---

[7] *CASA, Inc.*, 2025 U.S. LEXIS 2501, at *50 (Kavanaugh, J., concurring) ("[W]hen this Court makes a decision on the interim legal status of a major new federal statute or executive action—that decision will often constitute a form of precedent (*de jure* or *de facto*) that provides guidance throughout the United States during the years-long interim period until a final decision on the merits.").

Cir. May 3, 2025) (unpublished); *see also Sustainability Inst. v. Trump*, 2025 U.S. App. LEXIS 14121, at *5–7 (4th Cir. June 5, 2025) (unpublished) (agreeing "the Government is 'likely to succeed'" in light of *Dep't of Educ.*); *Maryland v. U.S. Dep't of Agric.*, 2025 U.S. App. LEXIS 8407, at *14 (4th Cir. Apr. 9, 2025) (unpublished); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 2025 U.S. App. LEXIS 10440 (4th Cir. Apr. 10, 2025) (unpublished)[8]; *cf. Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 135 F.4th 852, 852–56 (9th Cir. 2025) (Bumatay, J., dissental) (arguing the Supreme Court's holding in *Department of Education* that the "government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA" should have controlled).

As expected, though, there is a split on this jurisdictional issue—particularly with respect to the likelihood of success factor. The First[9] and Ninth Circuits have found the United States is ***not*** likely to succeed on this jurisdictional issue. *See, e.g., Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 2025 U.S. App. 13662, at *21–25 (1st Cir. June 4, 2025); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 2025 U.S. App. LEXIS 11745, at *9–10 (9th Cir. 2025). Tellingly, though, the Supreme Court granted a stay on July 14, 2025, after the First Circuit denied "the request for an . . . administrative stay." *New York v. McMahon*, 2025 U.S. App. LEXIS 13039, at *8 (1st Cir. May 27, 2025) (unpublished).

* * * * *

---

[8] In this case, the Plaintiffs—after receiving a grant termination letter under § 200.340—filed suit: alleging constitutional and APA challenges. The District Judge granted the request for a preliminary injunction. *See* 770 F. Supp. 3d 822 (D. Md. 2025). The Fourth Circuit then stayed the preliminary injunction in light of the Supreme Court's decision in *Department of Education*.

[9] In the Reply (**Doc. 24 at 3**), Plaintiff cites to *California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025) to support their argument regarding jurisdiction. But that decision was reversed by the Supreme Court. *See Dep't of Educ.*, 145 S. Ct. 966.

This Court agrees with the Fourth Circuit, the D.C. Circuit's merits panel, and Judge Bumatay's dissental. Reliance on recent Supreme Court cases—even those "emergency" docket[10] Opinions—is appropriate.[11] The ruling in *Department of Education* controls. Granting an injunction—especially where this Court lacks jurisdiction—imposes a greater risk of harm to the United States vis-à-vis the purported harm to Plaintiff that stems from requiring the United States to award grant money that it says is no longer in its interests. *Cf. Trump v. Wilcox*, 605 U.S. __, 145 S. Ct. 1415, 1416 (2025) ("The stay . . . reflects our judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty.").

---

[10] These opinions are found at the "Opinions Relating to Orders" portion of the Supreme Court's webpage. *See* https://www.supremecourt.gov/opinions/relatingtoorders/24.

   Not infrequently, though, the Justices themselves refer to these Opinions as part of their "emergency" docket. *See, e.g., SSA v. Am. Fed'n of State*, 145 S. Ct. 1626, 1629 (2025) (Jackson, J., dissenting from the grant of the application for stay) ("[T]his Court's emergency-docket . . . ."); *Trump v. Wilcox*, 145 S. Ct. 1415, 1418 (Kagan, J., dissenting from the grant of the application for stay) ("Our emergency docket . . . ."); *Labrador v. Poe*, 144 S. Ct. 921, 931 (Kavanaugh, J., concurring in the grant of stay) ("[T]his Court's emergency docket . . . ."); *United States v. Texas*, 144 S. Ct. 797, 800 (Barrett, J., concurring in the denial of applications for stay) ("Before this Court intervenes on the emergency docket . . . ."). SCOTUSBlog also refers to these cases as the "emergency docket" on its website. *See* https://www.scotusblog.com/case-files/emergency/emergency-docket-2024/.

   Years ago, some legal commentators coined the phrase "shadow docket." *See* William Baude, *Foreword: The Supreme Court's Shadow Docket*, 9 N.Y.U. J. L. & LIBERTY 1 (2015); Stephen I. Vladeck, *The Solicitor General and the Shadow Docket*, 133 HARV. L. REV. 123 (2019).

   Others have (recently) taken to calling this portion of the Supreme Court's case load the: "preliminary relief docket," "interim relief docket," "short order docket," and/or "All Writs Act docket." *See* Advisory Opinions Podcast, *SCOTUS Sides with Trump*, THE DISPATCH, at 40:10–41:15 (June 27, 2025) (downloaded using iTunes).

* * *

   Irrespective of the name, these decisions are substantive filings—albeit, on cases where the Supreme Court didn't formally grant certiorari and oral argument. Thus, this Court concludes the precedential value of these cases isn't limited by the fact the Court issued them on its emergency docket.

[11] At oral argument and in the Reply, Plaintiff says the "precedential value" of decisions from the Supreme Court's "emergency docket" is "limited." **Doc. 24 at 4–5**. This Court disagrees—as have other district courts and a few courts of appeals.

## DISCUSSION

### I. These Contract Claims Belong in the Court of Federal Claims

In a recent dissenting opinion Justice Alito raised the question, "Does a single district-court judge who likely lacks jurisdiction have the . . . power to compel . . . the United States to pay out (and probably lose forever)" millions of "taxpayer dollars?" *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. at 753 (Alito, J., dissenting from denial of application to vacate). Relying on the above-cited cases, this Court answers that question in the negative. The non-continuation of Plaintiff's grant funding is the type of contract claim that gives rise to Tucker Act jurisdiction.

Lawyers cannot "craft suits, ultimately seeking money from the Government, as suits for declaratory or injunctive relief without mentioning the money." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). Neither may litigants "dress[] up a claim for money as one for equitable relief" in order to "remove the claim from Tucker Act jurisdiction and make it an APA case." *Id.* (citations omitted); *see also Rogers v. Ink*, 766 F.2d 430, 434 (10th Cir. 1985) ("A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.").

Here, Plaintiff attempts to mount statutory claims and constitutional challenges—but ultimately the controversy is over a contract. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 7–8 (2012) (finding that Plaintiffs' attempt to raise constitutional issues in the district court did not confer jurisdiction therein). Congress created a contractual scheme for allocating funds to the grantees. And those "exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act purposes." *Widakuswara*, 2025 U.S. App. LEXIS 11036, at

*11 (citing *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–39 (Fed. Cir. 2021)). Thus, contract enforcement cases with the United States can only be resolved through the specific procedures provided in the Tucker Act—which means the appropriate avenue is to bring suit "in the Claims Court." *Bowen v. Massachusetts*, 487 U.S. 879, 890 n.13 (1988).

Moreover, "[o]ur democracy cannot very well function if individual judges issue extraordinary relief to every plaintiff who . . . object[s] to executive action . . . . If any funds have been wrongfully withheld, such funds may be recovered at the end of a successful lawsuit . . . in [the] appropriate forum." *Am. Ass'n of Univ. Professors & Am. Fed'n of Tchrs. v. U.S. Dep't of Just.*, No. 25-cv-2429, 2025 U.S. Dist. LEXIS 114591, at *5 (S.D.N.Y. June 16, 2025).

* * *

Rather than challenging a regulatory action with some monetary implications, Plaintiff seeks payment of "the grant monies" it claims "entitle[ment] to." **Doc. 9 at 25**. That's the "essence" of this suit. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1112 (D.C. Cir. 2022) (citation omitted). Plaintiff claims entitlement to over $2 million in grant money. *See* **Doc. 1 at ¶ 82**; **Doc. 1-3 at ¶ 4**. Stated another way, Plaintiff is "'in essence' seek[ing] more than $10,000 in monetary relief from the federal government." *Kidwell v. Dep't of the Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *cf. Bowen*, 487 U.S. at 916 (Scalia, J., dissenting) ("[D]istrict court jurisdiction is not established merely because a suit fails to pray for a monetary judgment.") (citing *United States v. Kansas City, Kan.*, 761 F.2d 605, 608 (10th Cir. 1985)).

Of note, the district court in *Department of Education* did not expressly require payment, *see California v. Dep't of Educ.*, No. 25-cv-10548, 2025 U.S. Dist. LEXIS 46420, at *4–5 (D. Mass. Mar. 10, 2025), yet the Supreme Court understood the district court's order as "enjoining

the Government from terminating various education-related grants." *Dep't of Educ.*, 145 S. Ct. at 968. And at the end of the day, the reasoning of *Department of Education* controls.

## II. Preliminary Injunction Analysis

Assuming this case meaningfully differs from *Department of Education* because Plaintiff asserts "non-APA claims," *Sustainability Inst.*, 2025 U.S. App. LEXIS 14121, at *10 (Heytens, J., dissenting), the Court now undertakes a traditional preliminary injunction analysis.

### A. Likelihood of success on the merits

Likelihood of success on the merits is the threshold issue. *See Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). A "substantial likelihood" is defined as "a prima facie case showing a reasonable probability that [the movant] will ultimately be entitled to the relief sought." *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781 (10th Cir. 1964). Since Plaintiff seeks a disfavored injunction, it faces a heavier burden in establishing that this factor is satisfied.

### 1. First Amendment

Plaintiff alleges that Defendants violated the First Amendment by "penaliz[ing] or suppress[ing] private speech because of its content or viewpoint." **Doc. 1 at ¶ 121.**

The Court treats this as a claim to freedom of expressive association. Expressive association is the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Schalk v. Gallemore*, 906 F.2d 491, 498 (10th Cir. 1990) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984)). Of course, this right is not "absolute" because "there may be countervailing principles that prevail over the right of association." *Grace United Methodist Church v. City of Cheyenne, Wyo.*, 451 F.3d 643, 658 (10th Cir. 2006) (citation omitted).

In evaluating Plaintiff's expressive association claim, the first step is to determine whether the group engages in expressive association. A group claiming protection "must engage in some form of expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). In this case, Plaintiff alleges that school employees' protected speech "after . . . hours and outside their official duty . . . on or off campus" is being penalized. **Doc. 1 at ¶¶ 118–131**.

While education is certainly important, "assign[ing] readings, invit[ing] guest speakers, or engag[ing] in discussion and debate with students on ***anything***" is not protected. **Doc. 1 at ¶ 129** (emphasis added); *see Mahmoud v. Taylor*, 606 U.S. __, 2025 U.S. LEXIS 2500, at *67–68 (2025). The speech rights "of public school employees" are not "so boundless that they may deliver any message to anyone anytime they wish." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022); *see also Garcetti v. Ceballos*, 547 U.S. 410, 417–19 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."). And as Defendants point out, the First Amendment does not permit discrimination (**Doc. 21 at 38–40**).

Moreover, the DCL and "Notice of Non-Continuation" are not unduly coercive. *See generally Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175 (2024). The discontinuation of grant money does not infringe on free speech because Defendants' actions do not prohibit or compel private speech. Likewise, the non-continuation of grant funding does not prevent Plaintiff from associating with students. The discontinuation of grant funding only applies speech in which the "government is itself the speaker." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001). Plus, the United States has more leeway with funding decisions than it does with regulations. *Compare Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the

public interest . . . ."), *with Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("[G]overnment regulation may not favor one speaker over another."). Accordingly, Plaintiff has failed to demonstrate a substantial likelihood of success on the merits as to their First Amendment claim.

### 2. Fifth Amendment "void for vagueness"

Plaintiff's claim (**Doc. 1 at ¶¶ 135–40**) is properly characterized as a facial challenge— given that Plaintiff takes issue with the DCL "as a whole." *Moody v. NetChoice, LLC*, 603 U.S. 707, 717 (2024). To succeed on such a void-for-vagueness challenge, Plaintiff must show that "the enactment is impermissibly vague in all its applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982).

Because a void-for-vagueness challenge is essentially a due process claim, Plaintiff must also establish the deprivation of a protected interest in liberty or property. *See United States v. Miller*, 868 F.3d 1182, 1187 (10th Cir. 2017) ("The void-for-vagueness doctrine derives from the Due Process Clause of the Fifth Amendment." (citation omitted)); *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) ("Since a void-for-vagueness challenge is ultimately a due-process claim, a plaintiff must allege that he was deprived of a constitutionally-protected property or liberty interest." (citations omitted)). But Plaintiff has not identified a protected property or liberty interest in a continuation of the grant funding (which is fatal to the void-for-vagueness due process claim). *See, e.g., Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643, 2025 U.S. Dist. LEXIS 128304, at *44 (D.D.C. July 7, 2025) (concluding there is no "plausible property interest in . . . grant awards"); *Nat'l Urb. League v. Trump*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 83732, at *61 (D.D.C. May 2, 2025) (same). Beyond the U.S. District Court for the District of Columbia, other courts have—likewise—resisted applying due process principles to

government contract disputes. *See, e.g., Nat'l Juv. L. Ctr., Inc. v. Regnery*, 738 F.2d 455, 465 (D.C. Cir. 1984) (per curiam) (finding an insufficient interest in "continued government funding"); *Coastland Corp. v. Cnty. of Currituck*, 734 F.2d 175, 178 (4th Cir. 1984) ("A mere breach of contractual right is not a deprivation of property without *constitutional* due process of law." (cleaned up)); *Taake v. Cnty. of Monroe*, 530 F.3d 538, 541 (7th Cir. 2008) (same).

Plus, "[a]ny concerns of vagueness regarding exactly what authority an agency may have to terminate a grant are internal considerations for the agency itself." *Chi. Women in Trades v. Trump*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 70459, at *43–48 (N.D. Ill. Apr. 14, 2025). Discontinuing DEI-related grants—or indicating a desire to do so, as the DCL does (**Doc. 1-1 at 3**)—is not any vaguer than "awarding scholarship and grants on the basis of subject criteria such as 'excellence,' which the Supreme Court allowed in *Finley*." *Id.* at *47 (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998)). And as Defendants point out, the DCL "prohibits no more than what Title VI prohibits." **Doc. 21 at 42**.

Finally, as explained earlier, Defendants are likely to succeed in showing that the Tucker Act precludes this Court from exercising jurisdiction over any claims pertaining to individual grant agreements (even if framed as a constitutional action). *See, e.g., Child. Trends, Inc. v. U.S. Dep't of Educ.*, No. 25-cv-1154, 2025 U.S. Dist. LEXIS 111199, at *22 (D. Md. June 11, 2025); *Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, No. 25-cv-298, 2025 U.S. Dist. LEXIS 127513, at *54 (D.D.C. July 6, 2025) ("Plaintiffs . . . may not circumvent the Tucker Act or the APA's reviewability bar by reframing an alleged statutory violation as a constitutional claim."); *Validata Chem. Servs. v. U.S. Dep't of Energy*, 169 F. Supp. 3d 69, 89 (D.D.C. 2016) (rejecting Plaintiff's "attempt to reframe" a bid protest cause of action as a constitutional challenge).

### 3. Spending Clause[12]

Next, Plaintiff claims the DCL and "Notice of Non-Continuation" infringe on Congress's powers. **Doc. 1 at ¶¶ 141–48 & ¶ D**. Plaintiff says the "April termination action amounts to a retroactive and ambiguous condition on mental health grant funding." **Doc. 9 at 34**. Defendants say Plaintiff's reliance on "the second *Dole* factor" is misplaced because "the non-continuation decision" is not "retroactive." **Doc. 21 at 46**.

Under the Spending Clause, Congress has "broad discretion to . . . fund[] particular state or private programs or activities." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). But the Spending Clause is only implicated "when Congress imposes a spending or funding condition." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 100078, at *69–71 (D.D.C. May 27, 2025). And without alleging congressional action, Plaintiff "cannot state a claim under the Spending Clause." *Id.* at *70–71. Plus, "it is rare enough for a[] statute to confer an enforceable right," and "spending-power statutes . . . are especially unlikely to do so." *Medina*, 222 L. Ed. 2d at 580.

Every year, to continue receiving the grant funding, the Secretary needed to determine the project is in the "best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5). This year, Defendants determined that 70 grants would not be continued. *See* **Doc. 21 at 10 n.3**. Plaintiff was one of those non-continued grants. But the fact each year's grant funding was subject to renewal means Plaintiff loses. *Cf., e.g., Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 281 n.11 (D. Md. 2025) (finding a grant termination was vague, but not deciding it violates the Spending Clause).

---

[12] "The Constitution has no 'Spending Clause,' strictly speaking." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. __, 222 L. Ed. 2d 567, 581 (2025) (citing U.S. CONST. art. I, § 8).

For these reasons, the Court concludes that Plaintiff is unlikely to succeed on the merits of the Spending Clause challenge (**Doc. 1 at 38 ¶ D**).

Moreover, the Spending Clause argument fails in light of the contract analysis above. *See supra* ¶ I. In no small part that's because "Spending Clause legislation operates 'much in the nature of a contract.'" *Moyle v. United States*, 603 U.S. 324, 355 (2024) (Jackson, J., concurring in part and dissenting in part) (citation omitted).

### 4. Ultra vires

To state an *ultra vires* claim, Plaintiff must show the "officer . . . act[ed] without any authority what[so]ever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984). This is a high bar.

Here, neither the DCL (nor the "Notice of Non-Continuation") directs the agency to take any actions inconsistent with law. *See* **Doc. 21 at 50–51**. As detailed above, the express language says the opposite—emphasizing the need to comply with applicable law. *Cf. Trump v. Am. Fed'n of Gov't Emps.*, 2025 U.S. LEXIS 2667, at *1. Moreover, the President possesses the authority to direct agencies to implement his agenda—consistent with each agency's underlying statutory authorities. *See, e.g., Myers v. United States*, 272 U.S. 52, 135 (1926); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."); *Bldg. & Const. Trades Dep't v. Allbaugh,* 295 F.3d 28, 32 (D.C. Cir. 2002) (Ginsburg, C.J.) ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (citation omitted)).

Additionally, *ultra vires* review is "unavailable where a statutory review scheme provides [plaintiff] with an adequate opportunity for judicial review." *Nuclear Regul. Comm'n v. Texas*,

605 U.S. __, 222 L. Ed. 260, 276 (2025) (citing *Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991)). The Tucker Act provides such an opportunity.

### 5. APA claims

Again, the Court believes that *Department of Education* settled the APA issue. *See supra* ¶ I. But a few more words should be said about the underlying Federal Regulations.

Plaintiff argues that the termination of the grant award is improper under § 200.340. **Doc. 9 at 5, 23, 24, 36–39**; *see also* **Doc. 1 at ¶¶ 68–72**. But the United States submits that section doesn't apply—because the grant was *discontinued*, not terminated. *See* **Doc. 21 at 50–51**. According to Defendants, 34 C.F.R. § 75.253 controls.

The Court turns to the text.

Section 200.340 is, aptly, titled "Termination." One provision in that code section says a grant can be terminated if they fail to "effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). In contrast, § 75.253 is titled "Continuation of a multiyear project after the first budget period." Under this code section, a grant may not be continued unless the Secretary determines the "project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5). Given the fact the funding was not renewed, the latter regulation is more on the nose. *See Am. Ass'n of Colls. for Tchr. Educ.*, 2025 U.S. Dist. LEXIS 48368, at *12–13 & 46 (finding § 75.253 inapplicable when a grant was terminated). Despite Plaintiff's attempt to frame the action as a "termination," in the pleadings, the document itself is titled "Notice of Non-Continuation of Grant Award." *See* **Doc. 1-2**. Moreover, the letter relies on 34 C.F.R. § 75.253. *Id.* Defendants' decision was based on a determination that continuing the project was not "in the best interest" of the Government. *Id.* **at 1**.    To succeed, Plaintiff must show that the DCL and

"Notice of Non-Continuation" directs illegal agency action and cannot be implemented lawfully. That is not the case here.

For one, it's not clear that this Court can review this "agency action" under 5 U.S.C. § 701(a)(2). *See* **Doc. 21 at 32–35**. Defendants' decisions—which concerned how to allocate a grant award that is, purportedly, not in the best interest of the Government—seems like a quintessential decision committed to agency discretion by law.

Supreme Court case law supports this point. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Indian Health Service's decision to discontinue funding one program and instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA. The Supreme Court found that the "allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Id.* at 192. Here, like there, the Bipartisan Safer Communities Act is a lump-sum appropriation. *See* 136 Stat. 1313, 1340–42. As then-Judge Antonin Scalia stated: "A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984). As in *Lincoln*, the agency—*i.e.*, Defendants—are better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.[13]

*   *   *

---

[13] "[A]n agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise'; whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

Also, to the extent Plaintiff challenges the FAQs the Court does not find these are a final agency action subject to the APA. *See Am. Fed'n of Tchrs. v. Dep't of Educ.*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 77811, at *68–69 (D. Md. Apr. 24, 2025) (concluding the same). Neither is the "End DEI" portal. See *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 946 (D.C. Cir. 2012) (concluding FDA website did "not constitute final agency action."); *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Defense*, 990 F.3d 834, 836 (4th Cir. 2021) ("[M]aintaining and managing the website" is not "final agency action.").

* * * * *

If Defendants' discontinuation of the grant violates the APA, then Plaintiff must seek redress in the Court of Federal Claims. *See supra* ¶ I; *see also U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 158 (D.D.C. 2025) (concluding "motion is, at its core, seeking a purely contractual remedy"). But the non-continuation might very well have complied with the APA. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 140–43 (D.D.C. 2025) (finding that "Plaintiffs are unlikely to succeed on their APA challenge as to the large-scale terminations").

The Court concludes this case belongs in the Federal Court of Claims. But even so, the recent case law seems to indicate this is a "heads Defendants win, tails Plaintiff loses" situation.

### B. Irreparable harm

The Court now turns to the second factor—which requires Plaintiff to "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

To be sure, Plaintiff alleges that "irreparable harm" will result absent an injunction. *See* **Doc. 1 at ¶¶ 81, 110, 131, 140, 153**; **Doc. 9 at** *passim*. But later-in-time money damages—*i.e.*, disbursement of the non-renewed future year grant money—would solve Plaintiff's purported

injuries. This means injunctive relief isn't the only remedy. Nor is the harm irreparable. *See* **Doc. 21 at 4** (arguing "the challenged decision does not pose any imminent, irreparable harm.").

On the other hand, a preliminary injunction would irreparably harm the President's ability to execute Executive Branch policies. *See Heckler v. Turner*, 468 U.S. 1305, 1307–1308 (1984) (Rehnquist, J., in chambers) (stating an injunction that forces the United States to make payments is an "irreparable injury"). Harm to Defendants flow from an inability to put the genie back in the bottle once the funds from the public fisc are spent. *Cf. State v. U.S. Dep't of Educ.*, 132 F.4th 92, 100 (1st Cir. 2025) (acknowledging "the Department [of Education] may incur some irreparable harm if it cannot recoup this money").

As this Court conducts the preliminary injunction analysis, it must take heed of "equity's concern 'with justice . . . also for the defendant.'" *CASA, Inc.*, 2025 U.S. LEXIS 2501, at *39 (Thomas, J., concurring) (first citing Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 468 (2017); and then citing H. McCLINTOCK, HANDBOOK OF THE PRINCIPLES OF EQUITY 78 (2d ed. 1948)). The Court concludes that Plaintiff cannot make a sufficient showing as to irreparable harm unless the injunction is issued. On the other hand, Defendants can make such an argument. "[E]lections have consequences and the President is entitled to enact his agenda." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 71378, at *5 (D.R.I. Apr. 15, 2025).

### C. Remaining factors

Because Defendants are likely to succeed on the merits and because Plaintiff did not prove irreparable harm, the Court need not analyze the remaining factors. *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014) (unpublished) ("[A movant's] failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted."); *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256,

1260 (10th Cir. 2004). Even so, other courts have said a preliminary injunction requires the weighing of "all four factors, taken together." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014). Because of this, the Court also analyzes the balance of equities and public interest factors. When, as here, the United States is the opposing party, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

* * *

Plaintiff asserts the remaining factors favor injunctive relief. *See* **Doc. 9 at 40–41**. As expected, Defendants argue the final factors lean in their favor. *See* **Doc. 21 at 52**. Both options have pros and cons. Injunctive relief would serve the public interest by providing extra mental health services in the future. And in the undersigned's view, continued funding of Plaintiff's grant is a worthwhile expenditure of federal funds. Based on the record developed so far in this case, the students are self-referring themselves to these mental health providers or being referred by faculty/staff. Whether it be for behavioral issues, classroom disruptions, suicidality, sadness, abuse, or something else, the record in this case, including witness testimony at the preliminary injunction, shows that the grant funding extended to Plaintiff does not appear to be used to promote one race or gender to the detriment of others. Moreover, the Court fails to see how "DEI" comes into play at all with respect to the funding of this grant. Frankly, the grant seems like a worthwhile expenditure of taxpayer funds—and this program seems consistent with the statutory text regarding appropriations for school based mental health services contained in the Bipartisan Safer Communities Act. Nevertheless, the Court declines to formally conclude the balance of equities and public interest factors weigh in Plaintiff's favor because there isn't jurisdiction in *this* Court for *these* claims. The "essence" of this case is about the Department of Education not renewing

24

the grant money. In fact, part of the relief sought (**Doc. 1 at 38 ¶ G**; **Doc. 9 at 42 ¶ G**) is about paying money. *See generally Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982).

Fortunately, this Court's job is not to make "value determinations" that "revolve around policy choices." *Schroder v. Bush*, 263 F.3d 1169, 1175 (10th Cir. 2001) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). On balance, these factors are a wash because the "wisdom" of decisions by the Executive branch "is none of [the Court's] concern." *Dep't of Homeland Sec. v. Regents of the Univ. of Cali.*, 591 U.S. 1, 35 (2020).

## CONCLUSION[14]

A preliminary injunction of the type requested by Plaintiff is an extraordinary remedy. For the reasons detailed above, Plaintiff is unable to establish a substantial likelihood of prevailing on the merits or irreparable harm. *See Ramirez v. Collier*, 595 U.S. 411, 421 (2022) (citation omitted). The Court concludes Defendants' non-continuation of the mental health grants does not violate the First Amendment, Fifth Amendment, or Spending Clause of the Constitution. Much the same, Plaintiff cannot reframe the contract enforcement claim so as to be brought under the APA.

Phrased differently, the Court declines to issue a preliminary injunction because Plaintiff has an "adequate remedy at law." *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 199 (2019) (citing *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 107 (1974) (reversing an injunction where "the Tucker Act guarantees an adequate remedy at law")). Plaintiff seeks an injunction "ordering . . . grant funding [be] reinstated . . . . [and] ordering Defendants to provide the Grant

---

[14] Defendants cited to three other "related" lawsuits across the Nation challenging the legality of the DCL, FAQ, and DEI portal (**Doc. 21 at 13–14**). *See, e.g., Am. Fed'n of Tchrs.*, No. 25-cv-628, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 77811 (D. Md. Apr. 24, 2025); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 25-cv-91, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 77874 (D.N.H. Apr. 24, 2025); *NAACP v. U.S. Dep't of Educ.*, No. 25-cv-1120, __ F. Supp. 3d __, 2025 U.S. Dist. LEXIS 78302 (D.D.C. Apr. 24, 2025). In each of those cases, the Judge granted the request for a preliminary injunction.
    This Court is not persuaded by the conclusions reached by those courts.

Recipients reimbursement." **Doc. 1 at 38**. Such a remedy is available in the Court of Federal Claims. *Dep't of Educ.*, 145 S. Ct. at 968.

      **IT IS THEREFORE ORDERED** that Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (**Doc. 6**) is hereby **DENIED**.

      **IT IS FURTHER ORDERED** that Plaintiff's Complaint (**Doc. 1**) is **DISMISSED without prejudice** for lack of jurisdiction.[15]

      **IT IS SO ORDERED**.

                  /s/

             _____

             WILLIAM P. JOHNSON
             SENIOR UNITED STATES DISTRICT JUDGE

---

[15] Of course, Plaintiff may refile this case in the Court of Federal Claims—and seek to enforce the contract under the Tucker Act. *See* 28 U.S.C. §§ 1491(a)(1) & (a)(2); *see also Ruiz v. Blinken*, 2022 U.S. App. LEXIS 3051 (D.C. Cir. Feb. 2, 2022) (unpublished and per curiam) (affirming a dismissal without prejudice that should have been brought in the Court of Federal Claims); *cf. Union Pac. R.R. Co. v. U.S. ex rel. U.S. Army Corps of Eng'rs*, 446 F. App'x 975, 976 (10th Cir. 2011) (unpublished) (same).